In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3510

EMIL ROMAN and DOCHITA ROMAN,/1

Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE,
and JANET RENO, Attorney General of the
United States,

Respondents.


Petition for Review of an Order
of the Board of Immigrations Appeals.
Nos. A72 412 189, A21 365 054


Argued August 9, 2000--Decided December 5, 2000



Before POSNER, RIPPLE and WILLIAMS, Circuit Judges.

RIPPLE, Circuit Judge.  Emil Roman and his wife
Dochita are Romanian natives and citizens who
seek review of the Board of Immigration Appeals'
("BIA") decision to deny their application for
asylum under the Immigration and Nationality Act
("INA") sec. 208(a), 8 U.S.C. sec. 1158(a), and
for withholding of deportation pursuant to INA
sec. 243(h), 8 U.S.C. sec. 1253(h). Mr. Roman
claims that he and his wife are unable to return
to Romania because he has suffered, and will
continue to suffer, political persecution from
former members of Nicolae Ceausescu's Communist
regime who now hold positions of power in the new
democratic government. For the reasons set forth
in the following opinion, we affirm the decision
of the BIA.

I

BACKGROUND

A.  Facts

Mr. Roman's troubles began in 1963 as a high
school student in Sibiu, Romania, when he refused
to join the Youth Communist Union. He claims
that, as a consequence, he "had no position" in
the school even though he was one of the best
students, and his application to college was

initially rejected. R.61. He ultimately was admitted to "mechanic[s']" college two hundred miles away in Bucharest, where he believed that he could more freely express his political opinions. R.62. One year later in 1968, Mr. Roman took part in a student demonstration against Ceausescu's Communist regime. According to Mr. Roman, he was constantly under surveillance because of his participation in the demonstration.

After college, Mr. Roman was hired by the government-owned Tarom Airlines as an aviation engineer. He worked at Tarom for twenty years until he left for the United States in 1992. Mr. Roman claims that every time he left the country for business, he was warned that, if he tried to apply for asylum, his possessions would be confiscated, his wife (a flight attendant at the same company) would be fired, and his daughter would be placed in an orphanage. The Securitate (secret police) questioned him hundreds of times, once for nine hours; however, he was never jailed. According to Mr. Roman, his wife Dochita had been married to a Securitate officer, and, after she divorced the officer, she "lost everything including her son." R.149. Mr. Roman also alleges that Dochita's ex-husband informed the Securitate that her family had "subversive characteristics." Id.

While at Tarom Airlines, Mr. Roman was asked to join the Communist Party many times, but always refused. As a result, he contends, he never was promoted. He claims that he never was fired, however, because he was highly qualified. About twice a year he would travel outside Romania for the company and, on one occasion, he was sent to the United States for training.

Mr. Roman was in Nigeria on business when Ceausescu's regime was overthrown in December 1989. He returned to Romania in January of 1990 and participated in demonstrations against the Communists who remained in power after the revolution. According to Mr. Roman, in September 1991, he was beaten by three miners because, he suspects, of his political beliefs.

At that time, Mr. Roman belonged to a group at Tarom that was attempting to privatize the company. The new leaders at Tarom told Mr. Roman that his efforts were futile, demoted him, and warned him that, if he did not mind his own business, he would have an "accident." R.72. Mr. Roman also was threatened over the telephone. In May 1992, he discovered that the tires of his car were punctured; one week later, the lug nuts on one wheel were loosened. Afterward, Mr. Roman received an anonymous phone call warning him that if he did not "shut up," he would have more

serious problems. R.153. According to Viorica Seceleanu, a former Tarom flight attendant, Mr. Roman was considered a "troublemaker" at Tarom, although she did not know why. R.114-15.

After the 1989 overthrow of Ceausescu's Communist regime, there were no restrictions on Mr. Roman's travel outside of Romania. Prior to his July 1992 arrival in the United States, he was permitted to travel to this country with his wife for vacation in December 1991 and again in April 1992. Mr. Roman decided to leave Romania for good when the "new Communists" (who were part of the old regime) came into power and threatened that, if he did not mind his own business, they would create a "file" for him and tell everyone that he was an "informer." R.84, 154. The Romanian government granted Mr. Roman an exit permit to leave the country.

B.  Administrative Proceedings

1.

Mr. Roman and his wife entered the United States in July 1992 as nonimmigrant visitors authorized to stay in the country for six months. They remained in the country after the authorization period ended, and, on May 11, 1993, the Immigration and Naturalization Service ("INS") issued an Order to Show Cause and Notice of Hearing charging the Romans with deportability under INA sec. 241 (a)(1)(B), 8 U.S.C. sec. 1251(a)(1)(B) (1994). A deportation hearing was held on November 12, 1993, in which the Romans admitted that they overstayed their authorized visit and requested asylum, withholding of deportation, and, in the alternative, voluntary departure.

Mr. Roman attached an eleven-page narrative statement to his asylum application detailing his claims of past persecution and his fears of reprisal should he return to Romania; he also submitted 75 published articles commenting on the repressive Ceausescu regime and the aftermath of the 1989 overthrow. On March 9, 1994, the immigration judge ("IJ") held an evidentiary hearing on the Romans' application for asylum and withholding of deportation. The IJ's demeanor at the hearing fairly could be described as brusque and impatient; the judge often criticized Mr. Roman's counsel for not getting to the point quickly enough./2 Further, the IJ repeatedly interrupted counsel's examination to ask questions of the witnesses.

At the request of the IJ, the State Department's Board of Human Rights and Humanitarian Affairs ("BHRHA") issued an advisory opinion in January

1994, observing that under the Ceausescu regime, Mr. Roman and his wife "prospered in terms of education, employment, and travel abroad" and that "[there] is no way that somebody repeatedly threatened and harassed as he claims would have been so successful [for] so long under Ceausescu." R.118. The BHRHA further noted that Mr. Roman's account of persecution after the overthrow "comports badly with country conditions." Id. In a December 1993 country profile, the BHRHA opined that Romania has undergone fundamental changes since the overthrow of Ceausescu's repressive Communist regime in 1989. Although the country still struggles with the transition from a totalitarian and centralized state to a democracy with a free-market economy, civil liberties (i.e., freedom of speech, press, assembly, association, religion and travel) are respected. The BHRHA observed that anti-Communist sentiments cited by many asylum applicants now place them within the mainstream of political opinion. Although the BHRHA deemed the 1992 national elections a success, it noted that some Romanians are still suspicious of their leaders, many of whom held office under the previous regime. But the BHRHA opined that "current country conditions have so altered as to remove any presumption that past mistreatment under Ceausescu or in the chaotic first year after his overthrow will lead to mistreatment in the future. . . . Most Romanians have a difficult task in plausibly establishing that they would face severe and targetted [sic] mistreatment upon return to their country." R.120-21. The BHRHA also noted that a number of Romanians have abandoned refugee status and returned to Romania to claim property or arrange for relatives to join them in the United States.

After considering Mr. Roman's testimony as well as his narrative statement, the IJ denied the Romans' application for asylum and withholding of deportation, finding that Mr. Roman's claim was based "upon generalized statements, speculation, all of which are uncorroborated by any credible evidence." R.48. The IJ noted that Mr. Roman was never imprisoned in Romania, was not prevented from attending school or college, and was able to keep his job at a government-owned airline for twenty years until he left for the United States. The IJ then granted the Romans' alternative request for voluntary departure on or before June 9, 1994. The Romans appealed the IJ's decision to the BIA.

2.

Over five years later in September 1999, the BIA rendered its decision dismissing the Romans' appeal. First, the BIA addressed the Romans'

argument that the IJ limited their right to present their case, finding any alleged errors to be harmless because they did not identify any specific additional testimony that would likely change the result in the case. Nonetheless, the BIA did not adopt the analysis of the IJ, nor did the Board credit the opinion of the BHRHA as to Mr. Roman's treatment prior to the 1989 overthrow. Instead, the Board found credible Mr. Roman's account of events before the revolution, observing that "it is not inconsistent with pre-1989 country conditions in Romania that a needed 'technocrat' such as [Mr. Roman] would be subject to surveillance, threats, and harassment, particularly if he was seen as not following the Communist party line. . . . Clearly the management of the government owned airline for which [Mr. Roman] worked viewed him as not supporting the Communist Party philosophy." R.3. The BIA concluded, however, that such conduct did not rise to the level of persecution.

Relying on the BHRHA's December 1993 country profile, the BIA also found that the Romans failed to show a well-founded fear of future persecution, observing that the post-1989 changes in Romania were inconsistent with Mr. Roman's perception that he may be harmed in the future if he returned. The BIA also deemed Ms. Seceleanu's testimony unhelpful and the voluminous documentary evidence provided by Mr. Roman irrelevant to present country conditions. The Romans timely appealed the BIA's denial of asylum.

II

DISCUSSION

On appeal, the Romans argue that (1) the IJ violated their due process rights at the deportation hearing by repeatedly interrupting Mr. Roman's testimony and cutting off questioning; (2) the BIA violated their due process rights by failing to decide their appeal for more than five years; (3) the BIA erred in finding that Mr. Roman had not suffered past persecution; and (4) the BIA erred in finding that Mr. Roman had not established a well-founded fear of persecution.

A.  Due Process Violations

1.  Full and Fair Hearing

The Romans first argue that the IJ denied their right to a full and fair deportation hearing by repeatedly interrupting Mr. Roman's testimony and cutting off his counsel's questioning. They cite Podio v. INS, 153 F.3d 506, 509-11 (7th Cir.

1998), for the proposition that, in the past, the particular IJ who presided over their hearing has flouted asylum applicants' due process rights. This court reviews de novo the BIA's determination that the IJ did not violate due process. See id. at 509.

First, unlike in Podio, the IJ in this case allowed the Romans' corroborating witness to testify. Cf. id. (IJ refused to allow asylum applicant's siblings to testify that Ukrainian police were looking for him.). Although the IJ did appear to curtail counsel's examination of the witnesses (in a less-than-courteous manner), the judge's interruptions and follow-up questions were apparently intended to focus the hearing more directly on Mr. Roman's specific allegations of persecution. The IJ assured Mr. Roman at the hearing that he had read Mr. Roman's eleven-page narrative statement and, in the decision, noted that Mr. Roman "testified and essentially reaffirmed the contents of this narrative" which he had "carefully read and considered," R.47. See, e.g., Iliev v. INS, 127 F.3d 638, 642-43 (7th Cir. 1997) (possibly "brusque" conduct of IJ did not deny asylum applicant a fair trial based on lack of opportunity to fully present case). Moreover, Mr. Roman was permitted to testify about specific instances of mistreatment, including the problems he endured at Tarom even after the revolution. The IJ's impatience with the Romans' attorney does not suggest bias (he was equally brusque with the INS attorney), nor does it prove that the Romans were deprived of a fair hearing. See, e.g., Morales v. INS, 208 F.3d 323, 327-29 (1st Cir. 2000) (an alien's right to fair hearing was not violated despite IJ's impatience when alien was allowed to testify as to association with labor union and record did not indicate IJ ignored evidence); Mikhailevitch v. INS, 146 F.3d 384, 391-92 (6th Cir. 1998) (judge's questioning of alien's counsel was not intended to prevent alien from presenting evidence but to clarify time period and focus on alien's situation).

Second, to prevail on a due process claim, an asylum applicant must show prejudice. See Mojsilovic v. INS, 156 F.3d 743, 749 (7th Cir. 1998). The Romans fail, however, to allege any testimony excluded by the IJ that, if admitted at a new hearing, would potentially affect the outcome of their case. See Shahandeh-Pey v. INS, 831 F.2d 1384, 1389 (7th Cir. 1987) (alien must produce concrete evidence that violation of procedural protection actually had potential to affect outcome of deportation proceedings). Thus, their claim that the IJ violated due process is without merit.

2.  Undue Delay

     Citing our decision in Batanic v. INS, 12 F.3d
662 (7th Cir. 1993), the Romans argue that the
BIA's five-year delay in rendering its decision
denied them due process and, as a consequence,
they should be granted asylum retroactively to
the date of their application. The Romans'
reliance on Batanic is wholly misplaced. There,
the petitioner was found deportable at a hearing
in which he was denied the right to counsel. See
id. at 663-64. The BIA provided Mr. Batanic a new
hearing, but in the interim, Congress enacted an
amendment to the INA that rendered Mr. Batanic
ineligible for asylum. See id. at 664. In
reliance on the amendment, the IJ denied Mr.
Batanic's asylum application, and the BIA
affirmed. See id. On appeal, we noted that a
procedural defect, such as the denial of the
right to counsel, is generally cured by holding a
new hearing in which the defect is not present
(i.e. with the assistance of counsel). See id. at
667. However, where the procedural defect has
also resulted in the loss of an opportunity for
statutory relief, we observed that a new hearing
alone cannot cure the defect. See id. The delay
caused by the procedural defect in Mr. Batanic's
case operated to deprive him of his statutory
right to apply for asylum. See id. As a result,
we allowed Mr. Batanic to apply for asylum nunc
pro tunc to the time of his initial hearing. See
id. at 668.

     By contrast, in this case, "there was no
evidence that a procedural defect worked to
deprive [the Romans] of a specific statutory
right." Tamas-Mercea v. Reno, 222 F.3d 417, 427
(7th Cir. 2000). The Romans' argument that they
would have been granted asylum had the BIA
rendered its decision earlier is no more than
mere speculation. See id. Mr. Batanic, in
comparison, was unequivocally barred from seeking
asylum because of an intervening amendment to the
statute. Thus, the Romans have failed to show a
denial of due process comparable to that in
Batanic.

     The Romans also appear to argue that had the BIA
timely adjudicated their appeal, it would have
granted them asylum in view of this court's
opinion in Borca v. United States, 77 F.3d 210
(7th Cir. 1996). In Borca, this court reversed
the BIA's asylum determination because it had
employed the wrong standard. The Romans do not
assert, however, that the BIA reviewed their case
under an improper standard; they simply contend
that the BIA erred in crediting the 1993 State
Department report over Mr. Roman's own account of
his fears of reprisal. Thus, Borca also does not

help the Romans.

We are troubled, however, by the BIA's prolonged and unexplained delay, as we are faced with the predicament of reviewing a decision that may be based on information that is now outdated and obsolete. But because the Romans do not contend that this is the case, we fail to discern any prejudice from the delay.

B.  Asylum

To qualify for asylum, Mr. Roman must show that he is a refugee, or a person who is "unable or unwilling" to return to his native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. sec. 1101(a)(42)(A). To meet his burden of establishing the requisite fear of persecution, an asylum applicant "must present specific facts demonstrating that he has actually been the victim or [sic] persecution or has good reason to believe that he will be singled out for persecution." Petrovic v. INS, 198 F.3d 1034, 1037 (7th Cir. 2000). Our review of the BIA's determination of asylum eligibility is deferential; we shall reverse only if the record lacks substantial evidence to support the BIA's factual conclusions. See Sofinet v. INS, 196 F.3d 742, 746 (7th Cir. 1999).

1.  Past Persecution

Although there is no statutory definition of "persecution," we have described it as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." See id. (quoting Mitev v. INS, 67 F.3d 1325, 1330 (7th Cir. 1995)). The alleged conduct need not threaten the asylum applicant's life or freedom, but it must rise above mere harassment to constitute persecution. Id. Here, Mr. Roman argues that the constant surveillance, threats, and beatings, as well as the sabotaging of his car and his demotion at Tarom, compel a finding that he was persecuted on account of his political beliefs./3 The BIA deemed Mr. Roman's account believable but concluded that such conduct did not rise to the level of persecution.

Our difficulty with the BIA's finding as to persecution is that it only appears to address events that occurred before the 1989 revolution; the decision ignores Mr. Roman's allegations of more serious mistreatment that occurred after

Ceausescu's overthrow. See Dobrota v. INS, 195 F.3d 970, 974 (7th Cir. 1999) (BIA failed to consider submissions detailing unchanged political situation despite fall of Ceausescu); Hengan v. INS, 79 F.3d 60, 63 (7th Cir. 1996) (IJ neglected to fully consider Romanian asylum applicant's mistreatment after Ceausescu's overthrow). Two incidents in particular were never discussed: the September 1991 beating and the tampering with Mr. Roman's car in May 1992. Although we conclude that substantial evidence supports the BIA's determination that Mr. Roman's account of surveillance, threats and harassment prior to Ceausescu's overthrow did not amount to persecution, we cannot discern whether the BIA found that the post-1989 events likewise did not constitute persecution.

As to the first incident, Mr. Roman alleged that he was attacked by three miners visiting Bucharest because (as he originally thought) he was wearing "Western" clothes; he "later came to believe that the real reason was political." R.153. Although a finding of persecution does not require that the government actually perpetrate or incite the attack, an applicant must show that the government "condoned it or at least demonstrated a complete helplessness to protect the victims." Galina v. INS, 213 F.3d 955, 958 (7th Cir. 2000). The record here, however, does not support a conclusion that Mr. Roman's beating was orchestrated or allowed by the government. Although the articles Mr. Roman submitted with his asylum application suggest that in June 1990, miners from the western part of the country came to Bucharest at the behest of then-president Ion Iliescu to violently subdue the pro-democracy demonstrations, the record also indicates that when the miners returned to Bucharest in September 1991, they were there to protest Iliescu's democratic reforms and the steep economic downturn they believed the reforms had spawned.

The second incident is more troubling. Mr. Roman alleges that after Ceausescu's overthrow, he became a member of a group at Tarom Airlines who sought to reform the company toward democratization. This apparently angered the new management (who wanted to keep the Communist system intact), and, as a result, Mr. Roman claims that he was subjected to repeated threats and harassment. In May 1992, Mr. Roman contends that his tires were punctured in the Tarom parking lot and, one week later, the lug nuts were loosened. Afterward, Mr. Roman received an anonymous phone call warning him that if he did not "shut up," he would have more serious problems. R.153.

Although these actions appear to rise above "mere harassment," because the perpetrators attempted to follow through on their threats,/4 their connection to the government is unclear. See Nenadovic v. INS, 108 F.3d 124, 129 (7th Cir. 1997) (threats by manager at armaments plant, where the connection to government was unclear, did not amount to persecution); Mitev, 67 F.3d at 1330-31 (threats by coworkers as a result of applicant's anti-communist activism did not amount to persecution). Nor is there any indication that Mr. Roman reported the tampering with his car to the police or requested protection and, if so, whether that effort was in vain. Cf. Hengan, 79 F.3d at 63-64 (persecution found where applicant, a Romanian of Hungarian descent, received repeated, personal threats and authorities did nothing to protect her but instead began interrogating her weekly). Mr. Roman bears the burden of presenting specific facts to show he was persecuted, notably, that the government orchestrated, or at least sanctioned, the tampering with his car. See Petrovic, 198 F.3d at 1037. Because Mr. Roman has not come forward with such evidence, we cannot fault the BIA for concluding that Mr. Roman did not suffer past persecution.


   2.   Fear of Future Persecution

Although Romania is now a democracy, Mr. Roman insists that the country is run by former Communists. At the time of the asylum hearing, the elected president of Romania was Ion Iliescu, a former Communist who is now a member of the Social Democratic Party./5 Mr. Roman believes that, if he returns to Romania, he will be arrested and interrogated because he would be considered a "betrayer" for leaving the country. R.87. Further, former Securitate officers who previously had threatened him during the old regime, and who now occupy high positions in the government and at Tarom Airlines, might try to harm him because he was fighting for freedom. The BIA concluded, however, that "post-1989 changes in Romania are inconsistent with [Mr. Roman's] perception that he may be harmed in the future upon return to Romania." R.4. The record before us does not compel a contrary finding.

   To establish a well-founded fear of future persecution, an asylum applicant must show both that the fear is genuine and that a reasonable person in his circumstances would fear persecution. See Asani v. INS, 154 F.3d 719, 724 (7th Cir. 1998). First, as discussed above, many of the past incidents identified by Mr. Roman do not rise to the level of persecution under the statute and, thus, cannot form the basis for a

well-founded fear of persecution. See Tamas-Mercea, 222 F.3d at 426-27. Further, the 1993 State Department report belies Mr. Roman's contention that former members of the Communist Party would harm him because of his past political activities. To the contrary, the report states that "Romania has been profoundly transformed since the overthrow of . . . Ceausescu in 1989," R.119, and that "[a]nti-communist sentiments cited by many applicants place them now well within the democratic mainstream of political opinion and activity," R.120. The report also notes that a new law governing the Romanian Intelligence Service ("heir to the justly-hated Securitate") has "established parliamentary oversight over that organization and prohibits the hiring of most former Securitate officers." Id. Further, the old Securitate files are to be archived for 40 years, after which they are to be made public. The report concludes that "current country conditions have so altered as to remove any presumption that past mistreatment under Ceausescu or the chaotic first year after his overthrow will lead to mistreatment in the future." R.120-21.

We recently have reminded the BIA that it should treat the State Department's country report "with a healthy skepticism, rather than, as is its tendency, as Holy Writ." Galina, 213 F.3d at 959. Mr. Roman, however, has failed to identify any highly credible source of expert knowledge to contradict the State Department's evaluation of the likelihood of persecution if he is forced to return to Romania. See Vaduva v. INS, 131 F.3d 689, 691 (7th Cir. 1997). All of the articles Mr. Roman includes in the record predate the State Department report, most by at least two years. We have no reason to believe that conditions in Romania have worsened since the State Department issued its report in 1993, nor does Mr. Roman suggest that the BIA's decision was based on outdated information./6 See Tamas-Mercea, 222 F.3d at 425 (asylum applicant did not meet burden of showing well-founded fear of persecution should he be returned to Romania, where country profile indicated new intelligence organization did not have inclination or resources to pursue same type of surveillance as Securitate); Vaduva, 131 F.3d at 690-92 (asylum applicant lacked well-founded fear of persecution when he failed to rebut 1995 State Department Report citing profound changes in Romania since the overthrow of Ceausescu). Therefore, we believe there is substantial evidence to support the BIA's finding that Mr. Roman failed to show a well-founded fear of persecution./7

Conclusion

For the foregoing reasons, the petition for

review is denied, and the decision of the BIA is affirmed.

AFFIRMED

/1 On October 4, 2000, we granted the petitioners' motion to dismiss the appeal only as to the Romans' daughter, Diana.

/2 For example, the IJ commented, "Just tell, have him testify as to what actions he took. Period. I'm not interested in his philosophy. Okay?" R.59; "Come on, Mr. Geman. Now, let's get down to the claim. I don't care about his family history. I've got your claim here. I've read. Now, stick to this claim." R.64; "Now Mr. Geman, I'm going to tell you one final time. You've got your package here with his story, with his claim and its all set out in narrative form. All right? Now, let's get on with it." R.67.

/3 Mr. Roman also argues that his wife has been subject to persecution following her divorce from a Securitate officer, when she lost everything including her son. The record, however, contains no evidence indicating a nexus between this occurrence and her political opinions, thereby making a finding of persecution based on these events inappropriate. See Sofinet, 196 F.3d at 747 (upholding BIA's denial of asylum in part because there was no nexus between employer's reprimands and applicant's status as Seventh Day Adventist).

/4 See Galina, 213 F.3d at 957 (after receiving threats, phone call linked attack on asylum applicant's daughter to applicant's discovery of employer's list of prospective deportees); Boykov v. INS, 109 F.3d 413, 416 (7th Cir. 1997) (threats of immediate and menacing nature may, in some circumstances, constitute past persecution).

/5 Iliescu was since defeated in a 1996 election.

/6 There is no indication that Mr. Roman moved to reopen the case pursuant to 8 C.F.R. sec. 3.2 to supplement the record with more current information on conditions in Romania. See Kaczmarczyk v. INS, 933 F.2d 588, 597 (7th Cir. 1991).

/7 Last, Mr. Roman argues that the BIA erred in denying his request for withholding of deportation. The standard for withholding of deportation, however, is even more stringent than the standard for asylum. See Dobrican v. INS, 77 F.3d 164, 168 (7th Cir. 1996) (alien must establish "clear probability" of persecution).

Since the BIA's decision that Mr. Roman failed to demonstrate a well-founded fear of persecution is supported by substantial evidence, its determination that he failed to establish a "clear probability" of persecution is likewise supported by the evidence.