**Majed A. SAID, Petitioner,**

v.

**John D. ASHCROFT, United States Attorney General, Respondent.**

**No. 03–1118.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 2003.

Decided March 19, 2004.

Rebecca M. Shapiro, Azulay, Horn & Seiden, Chicago, IL, for Petitioner.

George P. Katsivalis, Department of Homeland Security, Office of the District Counsel, Chicago, IL, Linda S. Wernery, Department of Justice, Washington, DC, for Respondent.

Before EASTERBROOK, MANION, and KANNE, Circuit Judges.

## ORDER

Majed A. Said appeals a final order of the Board of Immigration Appeals (BIA) denying his application for asylum and withholding of removal. The BIA deter- mined that Said did not establish persecu- tion in the West Bank as required for his asylum and withholding of removal claims. In addition, after Said submitted additional evidence, the BIA denied his motion to remand the proceedings to the Immigra- tion Judge (IJ). We affirm.

### I.

Majed Said is a Palestinian born in a small village outside of Hebron in the West Bank. He claims a right to stay in the United States because of alleged past political persecution, and the likelihood of future political persecution. Despite rul- ing against Said, the IJ found him persua- sive and fully credited his testimony.

During Said's childhood and early adult- hood in the Middle East, he was known as a well-educated and practicing Muslim, re- spected far and wide for his incredible singing ability. He was a leader in the mosque and served as a "nasheet"–a sing- er of liturgical songs. Said obtained a visa to continue his studies in the United States and entered this country in 1988. He eventually terminated his studies in 1992 after running out of money.

Upon Said's return to the West Bank in 1992, his old friends threw a party at which he was the guest of honor. At this party, Said claims to have publicly ex- pressed his view that Arabs and Israelis could peacefully coexist. Approximately two weeks after the party, Said made a trip on foot to visit his uncle. On the way, he was approached by masked men with guns who "talked nicely to him," but ac- cused him of having collaborated with the Israelis. He denied the charge, and the masked men insisted that he had to secret- ly meet with them again in order to prove himself. The men implied that they would kill him if he spoke of the encounter or failed to attend the meeting. Said then

met with these men a second time, but only briefly. The men said at this second meeting that they were in a hurry to go elsewhere, but that it was a "good sign" that he showed up and that they would contact him for a third meeting. Before a third meeting could occur, Said fled back to the United States. Said's brother claims that he received inquiries into Said's whereabouts after he fled, and threats from the masked men that they would kill Said when they found him.

On October 14, 1997, the former INS issued Said a notice to appear, charging him with deportability under 8 U.S.C. § 1227(a)(1)(C)(i) (2000), for failing to comply with the conditions of the nonimmigrant status under which he was admitted to the United States. At a hearing before an IJ, Said testified that the masked men were members of the Palestinian Intifada. He speculated that the men had attended the party two weeks earlier and heard him express his desire for peace. He also stated that he was sought out by the men because of his education, leadership, and singing ability. In a sworn statement submitted with his asylum application, Said explained "my participation in their armed and violent uprising is what they were interested in regardless of my actual views or wishes."

On February 3, 1999, the IJ denied Said's application by finding that he had not been persecuted "on account of" his political beliefs. The IJ instead concluded that the men were interested in Said because of his United States education and special skills as a singer. The record reveals that singing ability is crucial to the anti-Israeli movement because of the pervasive use the Intifada makes of music to incite violence. The IJ also emphasized that the events upon which Said relied to support his asylum claim occurred over six years prior to the immigration hearing (now 12 years ago), and that if the men were really interested in persecuting Said or his family, they would have done so.

Said then appealed the IJ's decision to the BIA, and submitted additional evidence. Specifically, the additional evidence consisted of a letter from a professor who stated that Said's opposition to the men was a brave expression of political opinion, and that it did not seem strange that the militants did not take action against Said's family. The BIA affirmed the IJ's decision on December 16, 2002, and found that the new evidence was insufficient to change the outcome or warrant a remand to the IJ. This appeal followed.

## II.

### A.

In reviewing the IJ's decision (adopted by the BIA) we must affirm "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B)(2000). Said has the burden to show that a reasonable IJ would be compelled to find that he is a refugee who has suffered persecution or has a well-founded fear of persecution in the West Bank *on account of* race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added); 8 C.F.R. § 208.13(a). The "on account of" requirement is key to the asylum determination–"since the statute makes motive critical, [the asylum applicant] must provide some evidence of it, direct or circumstantial." *INS v. Elias–Zacarias,* 502 U.S. 478, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

Here, Said claims he was persecut-

ed on account of his political opinion.[1] He states that he expressed his views in favor of peace at his welcome-back party. As stated, the IJ fully credited Said's testimony. However, the IJ nonetheless concluded that Said was not recruited by the masked men because of his political opinion, but because of his special skills.

Said acknowledges that the men were interested in him because of his education, his singing talent, and his credibility as a leader. The record before the IJ reveals that singers are useful to the Intifada movement because religious songs recorded on cassette are used to incite violence against Israel. Said acknowledges the importance of his musical talent to this effort. The masked men were not concerned with discussing his actual views–when he denied being an Israeli collaborator, they simply said that they did not want to argue about it. Instead, they instructed him to meet with them again and to keep quiet about the meetings. This case is similar to *Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812, which involved a guerilla organization's attempt to recruit an alien "to fill their ranks in order to carry on their war against the government and pursue their political goals." Just as in *Elias–Zacarias*, the masked thugs' recruiting efforts directed at Said do not compel the conclusion that he was persecuted "on account of" his political opinion. Regardless of Said's views, he had specific value to the masked men as a voice through which their anti-Israeli sentiment could be spread.

On appeal, Said now attempts to shift the focus of his arguments from his special singing ability, education, and leadership to the views he stated at the party. Although the masked men stated that they had heard Said was an Israeli collaborator and threatened to kill him, this evidence does not compel the conclusion that he was sought out *because of* his political opinion. The masked men simply threatened to kill Said if he spoke of the meetings or failed to return. They did not threaten to kill him if he refused to change his views. The IJ concluded reasonably that the masked men were interested in Said's assistance, irrespective of his particular views. As a matter of fact, Said concedes "my participation in their armed and violent uprising is what they were interested in regardless of my actual views or wishes." *Elias–Zacarias* instructs that the persecution must be *"because of* that political opinion, rather than because of [the alien's] refusal to fight with them." *Id.* at 483, 112 S.Ct. 812 (emphasis in original). Accordingly, Said's own testimony establishes that the IJ was not compelled to conclude that Said encountered anything more than a heavy-handed recruiting visit.[2]

■ Moreover, even assuming that the masked men sought out Said because of his political opinion, he is unable to clear the high hurdle of showing that he suffered persecution. *See Meghani v. Immigration & Naturalization Service*, 236 F.3d 843, 847 (7th Cir.2001).[3] Said gives

1. To the extent that Said's wife is a proper party to this action [the government says she isn't, Said says she is], Said concedes that her application is dependent on the merits of his claim.

2. Because we hold that Said's asylum claim fails, he necessarily fails to establish the more stringent burden of proving eligibility for

withholding of removal. *See, e.g., Oforji v. Ashcroft*, 354 F.3d 609, 614 (7th Cir.2003).

3. We are likewise skeptical as to whether the conduct alleged by Said rises to the level of persecution for asylum purposes, even if he were sought out by governmental actors for his political views. A finding of persecution requires more than mere harassment. *See Roman v. INS*, 233 F.3d 1027, 1034–35 (7th

short shrift to his burden of demonstrating a governmental nexus to his alleged persecution. A finding of persecution "ordinarily requires a determination that government authorities, if they did not actually perpetrate or incite the persecution, condoned it or at least demonstrated a complete helplessness to protect the victim." *Id.* (citing *Roman v. INS,* 233 F.3d 1027, 1034–35 (7th Cir.2000)).

The masked men carried guns and expressed anti-Israeli views. However, Said apparently equates anyone in the West Bank who carries guns and expresses anti-Israeli views as in league with the Palestinian Authority.[4] The masked men did not identify themselves as members of the Intifada, and even if they did, Intifada simply means "uprising"–not all masked men in the West Bank area with guns who oppose the Israelis are cloaked with the imprimatur of the Palestinian Authority. Said's own expert, Professor Rashid Khalidi, describes the unorganized, freelance guerrilla activity that is prevalent in local Palestinian villages, such as Said's village of Tafouh or Tuffah. To be sure, the desire on the part of the masked men to keep their recruitment efforts secret implies that they were working underground and not at the behest of the Palestinian Authority, the entity supposedly in control of the area. Said's claims of association by inference do not compel a finding that the masked men were part of the Palestinian Authority or in cahoots with that entity.

Finally, Said complains that the heavy-handed recruiting he experienced is endemic to the West Bank and too widespread for the Palestinian Authority to stop, even if it desired. However, "[c]onditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum." *Id.* (citing *Mitev v. INS,* 67 F.3d 1325, 1330 (7th Cir.1995)). The general political upheaval that has been an unfortunate reality in the West Bank for many years is obviously threatening for many who live there, but such conditions do not merit asylum for those who manage to gain access to the much more stable and secure environment in the United States.

### B.

■ Said also challenges the BIA's refusal to remand his case for the consideration of new evidence. We review the BIA's denial of a motion to remand proceedings for an abuse of discretion. *Pop v. INS,* 279 F.3d 457, 460 (7th Cir.2002).

Said presented as new evidence a letter by Professor Khalidi, a history and international studies professor who has never met Said. This letter states that Said's

---

Cir.2000). Said admits that he was not physically harmed; that the masked men "talked nicely" to him; and their threats were placated by his attendance at meetings and silence. *Meghani* found that an asylum applicant who suffered a broken shoulder and wrist after being beaten by a rival political faction did not suffer persecution. *See Meghani,* 236 F.3d at 847; *see also Mendez–Efrain v. INS,* 813 F.2d 279 (9th Cir.1987) (holding that an asylum applicant did not suffer persecution, despite being detained and interrogated for four days by government soldiers in an attempt to get him to join the army of El Salvador).

4. For purposes of his asylum application, Said contends that he is stateless. At his birth, Hebron was governed by Israel, but has never been annexed or made a part of Israel. It is unclear from the record whether the Palestinian Authority is the governmental entity appropriately charged with policing the portion of the West Bank inhabited by Said. However, for purposes of Said's argument, we will assume that the Palestinian Authority is appropriately charged with police authority over the area in question.

opposition to the masked men constitutes a "brave expression of political opinion." The main tenor of the letter seeks to explain as standard Intifada procedure the masked men's failure to seek out Said's family because of a desire by the band to avoid sparking unnecessary local feuds. The BIA denied Said's request to remand, concluding that the new evidence was insufficient to change the outcome of his case.

The BIA did not abuse its discretion in denying remand because the letter fails to address key elements of the IJ's decision. Importantly, the letter does not address the IJ's finding that Said was recruited for special skills he would bring to the masked men's anti-Israeli efforts.[5] Khaladi's conclusion regarding the political opinion issue is contrary to *Elias–Zacarias*, as set forth above. Moreover, the BIA was within its discretion to discount the legal significance of Khalidi's opinions stating that the lack of violence directed toward Said's family members is typical Intifada procedure. This is particularly true since case authority regards violence directed toward an asylum applicant's family members in the Arab–Israeli conflict in some instances sufficient to establish persecution. *Cf. Baballah v. Ashcroft*, 335 F.3d 981, 988 (9th Cir.2003) (citing U.N. High Comm'r for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, II(B)(2)(a), ¶ 43 (Geneva 1992)).

### III.

The evidence does not compel the conclusion that Said suffered persecution on account of his political opinion. The BIA did not abuse its discretion in refusing to remand the case to the IJ for consideration of new evidence. We therefore affirm the BIA.

---

5. Said's makes the non sequitur argument in his reply brief that if the masked men only wanted to fill their ranks, they would have recruited his family members too. This is an about-face to Said's testimony and previous briefs which emphasize his distinctive education, singing skill and leadership–characteristics not shared by his family members–that made him an attractive recruit. Moreover, Said claims for the first time in his reply brief that he was the only member of his family to express a desire for peace. We do not consider this claim because Said's attorney fails to cite to the record as required by Fed. R.App. P. 28(a)(9)(A).