**Enver SHENGHERGHI, Petitioner,**

v.

**John ASHCROFT, Attorney General of the United States, Respondent.**

No. 03–2706.

United States Court of Appeals, Seventh Circuit.

Argued June 16, 2004.

Decided July 23, 2004.

Isuf Kola, Kola & Miceli, Bloomingdale, IL, for Petitioners.

George P. Katsivalis, Department of Homeland Security, Office of the District Counsel, Chicago, IL, Blair T. O'Connor, Carolyn M. Piccotti, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before COFFEY, RIPPLE, and WILLIAMS, Circuit Judges.

### ORDER

This immigration appeal presents the unusual circumstance of an ethnic Albanian, Enver Shengherghi (and his wife, derivatively), contending that he faces persecution if returned to the largely ethnically homogenous Albania because he in the past supported ethnic Albanians living in Kosovo and Macedonia. An immigration judge denied his petition for asylum, withholding of deportation, and relief under the Convention Against Torture. Although the IJ found Shengherghi credible, he nonetheless concluded that Shengherghi had failed to establish that the mistreatment he reportedly suffered in Albania was either executed or condoned by the Albanian government or that the government had been helpless to protect him. Shengherghi appealed to the Board of Immigration Appeals, which adopted the IJ's reasoning. Shengherghi now petitions for review of the BIA's decision. We deny the petition.

Shengherghi's application for asylum rests mostly on several incidents of self-described harassment and a beating he received from three unidentified, pro-Serbian men. Through his testimony at the asylum hearing, his application, and newspaper articles, Shengherghi established that he was a long-time composer of patriotic Albanian songs in Albania. Over twenty of these songs specifically address the rights of ethnic Albanians living in Kosovo and Macedonia. In 1997 Shengherghi, himself an ethnic Albanian, appeared on Albanian television to discuss the songs he had dedicated to Albanians living in Kosovo, stating during the interview that he hoped he would not die before he saw Kosovo free.

As Shengherghi sees it, Albanian citizens sympathetic to the pro-Serbian Milosevic regime then in control of Kosovo did not take kindly to his political views, leading to several confrontations throughout the mid to late nineties. The first of these incidents involved an individual who approached Shengherghi while he was playing at a piano bar and requested a Serbian song. After informing the man that he did not know the song, the man replied, "You play the music of the whole world, how could you not know?" On another occasion several pro-Serbian individuals tipped Shengherghi at the piano bar with Serbian currency to "provoke" him. Several days

later, unidentified individuals broke the windows of Shengherghi's home, an incident that Shengherghi believed was motivated by his pro-ethnic-Albanian stance. In addition, a listener called into a private radio station program discussing Shengherghi's songs, asking why Shengherghi talked of Kosovo when he was not a Kosovar.

The self-characterized harassment culminated in a beating one night in August 1999. As Shengherghi walked home from work, three unidentified men approached him. After establishing that he was indeed Shengherghi, the men told him that Kosovo belonged to the Serbs and first threatened to break his fingers, so that he would not "write any more for cause of Kosovo," and then threatened to kill him. They then proceeded to beat him with their fists, sticks, and rocks. Shengherghi awoke in the hospital with a broken elbow and damaged nerves in his hands. Following the attack, unidentified individuals phoned Shengherghi, warning him against going to the police and telling him to leave Albania. Fearing for his life, Shengherghi attests, he did not report the beating to the police or the government because "something worse" would happen to him.

During the asylum hearing Shengherghi testified that he believed the pro-Serbian men who beat him may have worked for the Albanian government, in addition to suggesting that some Socialist Party members may be Serbian sympathizers. At the same time, Shengherghi and his wife acknowledged at the hearing that pro-Serbian supporters constituted only a small minority of the Albanian government. And Shengherghi's testimony was in contrast to his asylum application, in which he stated that he was convinced he was "dealing with an anti-Albanian terrorist organization." Moreover, an article submitted by Shengherghi praised the Albanian government for opening up its borders to ethnic Albanian refugees from Kosovo and Macedonia. In any event, the record and the Department of State's Country Report on Albania show that the Albanian government is (and has been for several years) largely divided politically, rather than ethnically, between the Democratic Party and the majority Socialist Party (comprised of former Communist supporters), and there is no pattern of political retribution or mistreatment by the Socialist party. *See* Department of State, 2003 Country Report on Human Rights Practices: p. 10, available at www.state.gov/g/drl/rls/hrrpt/2003/27820.htm. But newspaper articles confirm that the Albanian police have been known to target members of the Democratic Party in addition to engaging in acts general brutality and corruption.

After living in hiding for six months, Shengherghi and his wife testified that they applied for visitors' visas to the United States, and arrived in June 2000. Six months after the visas expired, in June 2001, the two requested asylum and had a hearing before an IJ. After hearing Shengherghi and his wife's testimony and considering the submitted documents, the IJ concluded that Shengherghi could not establish any likelihood that he faced persecution if sent back to Albania. Although the IJ found Shengherghi's account of his career and the beating plausible, he doubted Shengherghi's assessment of the government's likely response had he reported the beating, believing it "incredible" that a government comprised mostly of ethnic Albanians would fail to take action against Serbian sympathizers who attacked a patriotic citizen of Albanian descent. The IJ thus determined that the record did not establish that the individuals who beat Shengherghi were agents of the government or acted with the acquiescence of the government, so Shengherghi could not es-

tablish past persecution at the hands of the government. Appealing the IJ's decision to the BIA, Shengherghi argued that there was substantial evidence showing he had suffered past persecution and faced a well-founded fear of future persecution and that the IJ violated his due process rights by failing to give him the proper admonishments about his rights to representation and to present his case. The BIA adopted the IJ's determination that Shengherghi would not be persecuted if he returned and also concluded that the IJ did not violate due process procedures.

To be eligible for asylum as a refugee, a petitioner is required to establish that he is an alien unwilling or unable to return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see INS v. Elias–Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Although not statutorily defined, persecution must cross the line from mere harassment to actions such as "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." Yadegar–Sargis v. INS, 297 F.3d 596, 602 (7th Cir.2002) (internal quotations and citations omitted). We will uphold the BIA's decision so long as it is supported by "reasonable, substantial, and probative" evidence in the administrative record as a whole. 8 U.S.C. § 1229a(c)(3)(A); see Elias–Zacarias, 502 U.S. at 481; Meghani v. INS, 236 F.3d 843, 846 (7th Cir.2001). Where the BIA has essentially adopted the decision of the IJ, we review the IJ's analysis. See, e.g., Toptchev v. INS, 295 F.3d 714, 720–21 (7th Cir.2002).

■ On appeal, Shengherghi first argues that the IJ should not have rejected his asylum petition based on his failure to report the beating to the police because Shengherghi should not have to report "human rights abuses" to a corrupt force that "is part of the problem." But Shengherghi never linked government officials to the beating—either by proving that they perpetuated or condoned the beating or by demonstrating their complete helplessness to protect him—so he did not established past persecution. See Roman v. INS, 233 F.3d 1027, 1034–35 (7th Cir. 2000); Galina v. INS, 213 F.3d 955, 958 (7th Cir.2000). Only Shengherghi's speculation that his pro-Serbian attackers were supported by a small minority of the government tied his beating to an official source, but mere speculation is not enough. See Roman, 233 F.3d at 1035 (petitioner bears burden of producing specific evidence that government orchestrated, or at least sanctioned, acts of persecution); Bhatt v. Reno, 172 F.3d 978, 982 (7th Cir.1999). Because Shengherghi never tried to seek help from the police or the government, he cannot demonstrate that they could not or would not protect him. Cf. Guchshenkov v. Ashcroft, 366 F.3d 554, 558 (7th Cir.2004) (where petitioner and his father repeatedly pursued complaints of beatings with police but police did nothing, decision denying asylum was unreasonable). Nor did Shengherghi provide evidence otherwise establishing a general official unwillingness or impotence to help those harassed by pro-Serbian supporters. If anything the record suggests that police in Albania are prone to target members of the Democratic Party. Shengherghi identifies with neither party. In addition, because the required showing for withholding of removal is more stringent than for asylum, Shengherghi necessarily fails to establish this claim. Tesfu v. Ashcroft, 322 F.3d 477, 481 (7th Cir.2003). Finally, Shengherghi fails to state a claim under the Convention Against Torture, as he has failed to show that "it is more likely than

not that he will be subject to torture by a public official, or at the instigation or with the acquiesces of such an official." *In re G–A–,* 23 I. & N. Dec. 366, 367, 2002 WL 968630 (BIA 2002) (citing 8 C.F.R. §§ 208.16(c) & 208.18(a)(1)).

■ Shengherghi's remaining due process arguments fare no better because they are both contradicted by the record. Shengherghi first asserts that the IJ failed to advise him that he had an opportunity to hire counsel under 8 U.S.C. § 1229a(b)(4)(A), but we count four separate occasions in which the IJ reminded Shengherghi that he had a right to representation at his own expense and confirmed that Shengherghi intended to proceed without counsel. In addition, upon first learning that Shengherghi knew of his right to hire counsel but could not afford to do so, the IJ provided Shengherghi with a list of free legal services that might be able to assist him. Shengherghi responded that he had contacted these organizations but was told that more time was required if they were to take his case, so the IJ postponed the hearing in part for Shengherghi to again try to obtain counsel. When he returned without counsel, the IJ reconfirmed that Shengherghi wished to continue pro se before proceeding.

■ Shengherghi's contention that the IJ failed to inform him of his rights under 8 U.S.C. § 1229a(b)(4)(B) to present his own evidence, examine and object to evidence offered against him, and cross-examine witnesses is equally without merit. The IJ explicitly informed Shengherghi of his right to bring witnesses and present evidence, even going as far as postponing the hearing twice so that Shengherghi could submit properly translated documents and urging him to bring

in a specific witness living in Chicago. And, although the IJ did not advise Shengherghi of his right to cross-examine witnesses, there were no adverse witnesses to cross-examine, so he suffered no prejudice. *See Roman,* 233 F.3d at 1033 (to prevail on due process claim requires showing of prejudice). Nor does Shengherghi identify any prejudice from the failure of the IJ to inform him that he could object to the customary admission of the State Department's Country Report for Albania and Profile of Asylum Claims and Country Conditions for Albania, both of which the government submitted. *See id.*

Because we conclude that substantial evidence supported the IJ's decision and the IJ committed no violations of due process, we DENY the petition.