**Ioan SOFINET, Petitioner–Appellant,**

v.

**IMMIGRATION AND NATURAL-
IZATION SERVICE, Respon-
dent–Appellee.**

**No. 98–2853.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 6, 1999.

Decided Nov. 2, 1999.

Y. Judd Azulay (argued), Azulay and Azulay, Chicago, IL, for Petitioner.

Kristen A. Giuffreda, Dept. of Justice, Office of Immigration Litigation, William J. Howard (argued), Margaret J. Perry, DOJ, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before ESCHBACH, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Ioan Sofinet, a native and citizen of Romania, seeks review of the decision of the Board of Immigration Appeals ("BIA"), which dismissed his appeal and issued a final order of deportation. Sofinet contends that the BIA failed to properly credit evidence that he suffered persecution because of his religion (Seventh Day Adventist) and that he has a well-founded fear of future persecution from Romanian government authorities. We deny Sofinet's petition for review and affirm the decision of the BIA.

## I.

Ioan Sofinet, a 34–year–old married male, is a native and citizen of Romania. Prior to his arrival in the United States,

Sofinet lived with his family in the Romanian town of Sighetul, located near the border between Romania and the Ukraine. He and his wife are practicing Seventh Day Adventists. His wife resides in the United States with him and his seven-year-old daughter resides in Romania with his in-laws.

In 1990, after graduating from military school, Sofinet began a nine-year commitment of service to the Romanian military in exchange for the military's financing of his education. While working as a police officer, he attended law school at the police academy and completed his law degree in 1994. Approximately one year after he began his police officer's job, on May 5, 1991, he was baptized as a Seventh Day Adventist. A week later, he married his wife in the Seventh Day Adventist church.

Sofinet testified that when he notified his supervisors on the police force about his religious conversion, they "responded to it in a negative way." His religious conversion created problems for him with the police force, principally because his job repeatedly required him to work on Saturdays—the Sabbath day for Seventh Day Adventists. However, he concedes that he was never suspended or fired for his refusal to work on the Sabbath. Sofinet explained that he had been arrested and imprisoned five times because he refused to work on Saturdays. For instance, he testified that he was punished by being arrested and imprisoned for three days when he refused to attend a June 1995 Saturday shooting practice.[1] According to Sofinet, the police force typically handled such job infractions by issuing a warning to the employee. Sofinet also testified that he was reprimanded by his supervisors for three other infractions: 1) when he

refused an order to "collect information"[2] on the Hungarians and Ukrainians in Romania; 2) when he was falsely accused in June 1995 of not properly carrying out his duties regarding the processing of an unidentified corpse discovered in the Tisa River; 3) when he refused to attend an official ceremony in 1992 at which only Catholic and "Orthodox" clergy would be present and where he would be required to kneel before a statue and lay a wreath. Despite these reprimands, Sofinet was promoted from the rank of police lieutenant to captain in October 1995.

Sofinet resigned from the police force ten days after his visa to the United States was granted in April 1996. In his resignation letter, he explained not only that his religious beliefs prevented him from working on Saturdays, but also that it was increasingly difficult for him to perform his job because of his refusal to work on Saturdays. Sofinet testified that he would be unable to find work as a police officer or as an attorney in Romania because his employment records listed his disciplinary problems with the police department. He further stated that he had not attempted to find employment in Romania outside of the fields of law or law enforcement.

Sofinet departed to the United States from Budapest, Hungary in May 1996, thirty-eight days after he resigned. He testified that he did not intend to return to Romania when his visa expired. He entered the United States on May 28, 1996, on a non-immigrant visitor visa which authorized him to stay in the United States until November 27, 1996. Sofinet overstayed his visa and has remained here ever since. He stated in his asylum application that he "will never" return to Romania. He claims that if he were to return, Roma-

---

1. Pursuant to provisions in Romania's Military Discipline Rules, Sofinet was punished with arrest for three incidents involving his "bad and careless attitude at work." This "shooting practice" incident was one of them.

2. It is unclear what Sofinet means by "collect information." When pressed at the hearing

to be more specific about this, Sofinet gave an example that such an assignment might be to interview Hungarians and Ukrainians on a national holiday in order to understand the different ways that they might be celebrating the holiday.

nian government authorities would detain and interrogate him and he would not be able to obtain employment. The Romanian police continue to send to Sofinet, at his home in Romania, citations threatening him with fines. According to Sofinet, his family members have been fined for his failure to respond to these citations and the "home telephone was put under permanent surveillance [by the State Security Police]."

At his February 1997 deportation hearing, Sofinet conceded deportability and requested an opportunity to apply for asylum. In his asylum application, he alleged that he had suffered persecution because he belonged to the Seventh Day Adventist religion. Sofinet did not include his wife in his asylum application.

In March 1997, an immigration judge ("IJ") conducted a hearing to address the merits of Sofinet's application. Prior to the hearing, the INS submitted a United States Department of State report on human rights practices in Romania in 1996. Sofinet was the only one to testify at his hearing. In addition to Sofinet's testimony, the IJ also reviewed and considered Sofinet's INS application and his submissions supplementing it; five written communications from Romanian government authorities who were investigating, reprimanding or punishing Sofinet for infractions;[3] six published articles from six different sources—all regarding work, political, and life conditions in Romania;[4] Sofinet's letter of resignation; and a letter from his wife and daughter.

In her oral decision, the IJ concluded that Sofinet had not established that he had been harassed or that "any persecution whatsoever had occurred." Accordingly, she denied him both asylum and withholding of deportation and ordered him deported to Romania. The IJ determined that since Sofinet had been promoted in his job and not fired from it, he had failed to establish that he was denied the right to practice his religion in Romania. To support this determination, the IJ also noted that Sofinet's wife had left her job voluntarily and was not "forced" from it. Further, the IJ found that Sofinet's evidence was inconsistent and lacked specificity. She observed that, beyond his assertions that he suffered discrimination, Sofinet failed to mention any incident "that would have even a remote nexus to any form of persecution." Finally, "as a matter of discretion" and because she concluded that his claim was "frivolous," she denied him voluntary departure.

On appeal, the BIA ultimately concluded that Sofinet failed to show that he had been persecuted because of his faith. First, the BIA determined that Sofinet had not established past persecution because the "individual and cumulative effect of the economic and other restrictions faced by [Sofinet] does not constitute persecution." Next, the BIA determined that Sofinet had not established a well-founded fear of future persecution. It explained that his assertions about what would happen to him if he returned to Romania were "conclusory," "largely unsubstantiated," and

---

**3.** The communications were as follows: 1) a December 1992 letter from the Head of Police, punishing Sofinet with three days of imprisonment for disobeying an order to attend an official ceremony; 2) a December 1996 citation from the police, threatening to fine Sofinet if he does not appear before them; 3) a letter of reprimand from the Sighetul police because Sofinet did not attend a scheduled Saturday target practice; 4) a December 1996 letter from the Chief Department of Penal Inquiries regarding an investigation of Sofinet's whereabouts and his departure to the United States; 5) a December 1996 letter from the Bureau of Penal Inquiries imposing a fine

and commanding Sofinet to appear before it or face a prison term.

**4.** The articles discussed the following: Romanian Senate deliberations about establishing a six-day work week to boost worker production; the political alignments of certain extremist Romanian politicians; human rights in Romania; political and social changes in Romania after the 1989 overthrow of the Communist government; the slow pace of economic development and reform in post–1989 Romania.

"not supported by the record." Because it concluded that Sofinet failed to establish that he qualified for asylum, the BIA decided that Sofinet did not qualify for withholding of deportation. Further, the BIA determined that Sofinet was ineligible for voluntary departure because the record contained "no evidence ... that [Sofinet] testified that he is willing and has the immediate means with which to depart the United States, if granted voluntary departure." On the basis of these determinations, the BIA dismissed Sofinet's appeal.

## II.

Sofinet contends that the BIA erroneously concluded that his experiences in Romania from 1991 to 1996 did not amount to persecution. First, he argues that he qualifies as a refugee for asylum purposes because not only has he suffered past persecution, but he also possesses a well-founded fear of future persecution. Second, he challenges the BIA's determination that he was ineligible for voluntary departure.

■ We use the substantial evidence standard to review the BIA's factual findings and a de novo standard to review the BIA's legal conclusions. *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir.1997). This court will reverse a decision of the BIA only if the record lacks substantial evidence to support the BIA's factual conclusions. *Sayaxing v. INS*, 179 F.3d 515, 519 (7th Cir.1999).

■ In order to be considered for asylum in the United States, Sofinet must demonstrate that he is a refugee. According to 8 U.S.C. § 1101(a)(42)(A) (1999), a refugee is any person outside his native country who is "unable or unwilling" to return to that country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." Although there is no statutory definition of "persecution," this court has described it as "pun-

ishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir.1995); *see also Draganova v. INS*, 82 F.3d 716, 720 (7th Cir.1996). The conduct in question need not necessarily threaten the petitioner's "life or freedom"; however, it must rise above the level of mere "harassment" to constitute persecution. *Borca v. INS*, 77 F.3d 210, 214 (7th Cir. 1996).

■ Sofinet attempts to demonstrate a well-founded fear of future persecution based on two factors: 1) Romanian government authorities continue to send citations to his family in Romania threatening him with fines; 2) he will be unable to find work if he returns to Romania. Sofinet argues that since he has established that he experienced past persecution at the hands of Romanian government authorities, there is a "reasonable possibility" that he will face such persecution again if he returns to Romania.

■ Sofinet's arguments presume too much about what he has established about his claimed persecution. To succeed in his claim that he has a well-founded fear of persecution, Sofinet must show that his fear of being singled out for future persecution is "subjectively real and objectively reasonable." *Sayaxing*, 179 F.3d at 520 (citation omitted). While an objectively well-founded fear of persecution may be "grounded in something less than a fifty percent probability of future persecution," *see Boykov v. INS*, 109 F.3d 413, 416 (7th Cir.1997), Sofinet must show "specific, detailed facts supporting the reasonableness of [his] fear that [he] will be singled out for persecution." *Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir.1999) (citations omitted).

The specific facts reveal that Sofinet enjoyed steady employment throughout the five years after his conversion to Seventh Day Adventism, up until his departure from Romania. Although he claims he was occasionally reprimanded because

of his religious beliefs, he offers only his own testimony to rebut the inferences that the reprimands and fines were legitimate punitive measures for his disobeying orders, failing to carry out duties, and breaking his commitment to work for the state for nine years. Sofinet now characterizes those disciplinary actions as persecution.

Beyond his own allegations and testimony, the record contains no evidence identifying and detailing the severity of his injuries from this claimed persecution or the nexus between this persecution and his status as a Seventh Day Adventist. *See Asani v. INS*, 154 F.3d 719, 724–25 (7th Cir.1998). In fact, Sofinet makes no claim that he has been hindered in any way from freely practicing his religious beliefs. *See Bucur v. INS*, 109 F.3d 399, 403–05 (7th Cir.1997) (evidence of persecution includes prohibition from practicing religion). Further, none of the supplementary articles and reports in the record concerns or even mentions Seventh Day Adventists in Romania.

Sofinet complains that a return to Romania would force him to choose between violating his religion or capitulating to an employer who requires him to work on Saturdays. Yet, Sofinet provided no evidence establishing that he sought work that did not require Saturday work hours. For instance, the IJ asked Sofinet how much research about employment possibilities he undertook in the 38 days between his resignation from the police force and his departure from Romania. Sofinet replied without elaboration, "Enough." Even if Sofinet had provided such evidence, it would help him little. This court has determined that unhappiness with work conditions does not demonstrate persecution. *See Krastev v. INS*, 101 F.3d 1213, 1217 (7th Cir.1996) (hard work not commensurate with one's training did not amount to persecution required for asylum); *Urukov v. INS*, 55 F.3d 222, 228 (7th Cir.1995) (Bulgarian government's restriction of ethnic-Macedonian's employment opportunities "does not rise to the level of 'infliction of harm' . . . that we find 'illegitimate' to justify granting asylum"). *See also Guentchev v. INS*, 77 F.3d 1036, 1037 (7th Cir.1996) (inability to obtain desired work does not establish persecution).

Sofinet's evidence of his family's status further weakens his claims. Sofinet's young daughter, his parents, his two sisters, and his in-laws have remained in Romania since he left it 1996. The record contains no evidence that any of them has been harmed while Sofinet has been in the United States. This court has determined that the absence of evidence of harm to the petitioner's family undermines the petitioner's claim of a well-founded fear of persecution. *See, e.g., Bhatt*, 172 F.3d at 982; *Lwin v. INS*, 144 F.3d 505, 509 (7th Cir.1998); *Tzankov v. INS*, 107 F.3d 516, 520 (7th Cir.1997); *Mitev*, 67 F.3d at 1332.

The record amply supports the BIA's conclusions that Sofinet's evidence regarding his fear of future persecution was "conclusory," "largely unsubstantiated," and "not supported by the record." The totality of Sofinet's submitted record contains evidence insufficient to demonstrate his claimed religious persecution. In fact, the evidence highlights only that Sofinet, at worst, experienced ridicule, harassment and self-initiated job termination because of his religious beliefs.

■ Without a well-founded fear of future persecution, Sofinet must establish "particularly heinous" past persecution in order to demonstrate that he has compelling reasons not to return to Romania. *See Bereza v. INS*, 115 F.3d 468, 475 (7th Cir.1997); *Bucur*, 109 F.3d at 406. Sofinet contends that the BIA lacked substantial evidence to support its finding that he had not suffered past persecution. He argues that he established past persecution through his testimony that supervisors at the police station treated him differently before and after he became a Seventh Day Adventist. To support his point, Sofinet analogizes his police work situation to an employment discrimination context in the United States—one where Title VII of the

Civil Rights Act has been violated because employees' religious practices have not been respected by the employer. His analogy fails to establish his past persecution; this court has determined that such discriminatory practices do not amount to persecution in the context of an asylum request. *See Bucur*, 109 F.3d at 402. *See also Sharif v. INS*, 87 F.3d 932, 935 (7th Cir.1996) (observing that "persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional").

Sofinet claimed that on five different occasions he was detained for periods of three days or less. He did not allege that he was beaten, tortured, or that his property was confiscated. *See Mitev*, 67 F.3d at 1330–31 (listing hallmarks of persecutory treatment); *see also Asani*, 154 F.3d at 723 (petitioner must demonstrate that detention involved more than "simple incarceration"). We have determined that "brief detentions and mild harassment" by themselves do not constitute persecution. *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir.1991).

■ Sofinet contends that because the BIA did not consider his testimony incredible and because he provided information to corroborate his testimony, he has provided sufficient evidence of his persecution. Contrary to Sofinet's assumption, merely filing an application and supplementary materials does not entitle him to a presumption of past persecution—those materials must provide specific and detailed evidence to support his claim. *See Bhatt*, 172 F.3d at 982. The record, however, lacks evidence linking his alleged hardship to his status as a Seventh Day Adventist. The information he provided in his testimony and supplementary documents fails to substantiate his claim that his past experiences rise to the level of persecution.

■ Finally, Sofinet argues that the BIA wrongly found him ineligible for voluntary departure. He also asks this court to grant him voluntary departure if it de-

nies his petition for review. If Sofinet had been granted voluntary departure, he could have selected his destination, avoided the stigma of deportation, and bettered his chances for legally returning to the United States. *See Guevara v. INS*, 52 F.3d 714, 715 (7th Cir.1995). This court lacks jurisdiction to review an appeal from denial of a request for an order of voluntary departure. *See* 8 U.S.C. § 1229c(f) (1999). Moreover, the decision to offer voluntary departure lies solely within the discretionary authority of the IJs and the BIA, as delegates of the Attorney General. *See* 8 U.S.C. § 1229c; *Guevara*, 52 F.3d at 715. Thus, this court also cannot act on Sofinet's request for voluntary departure.

On the basis of the foregoing, Sofinet's request for voluntary departure is Dismissed, his petition for review is Denied, and the BIA's decision is Affirmed.