Dimitar IVANOV and Elena Ivanova, Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 00–3363.

United States Court of Appeals, Seventh Circuit.

Argued April 25, 2001.

Decided May 21, 2001.

Before COFFEY, MANION, ROVNER, Circuit Judges.

### ORDER

Dimitar Ivanov and his wife Elena are Bulgarian citizens of Macedonian descent who seek review of the Board of Immigration Appeals' ("BIA") decision to deny their applications for asylum under the Immigration and Nationality Act ("INA") § 208(a), 8 U.S.C. § 1158(a), and for withholding of deportation pursuant to INA § 243(h), 8 U.S.C. § 1253(h). The Ivanovs

claim that they cannot return to Bulgaria because Dimitar has suffered, and will continue to suffer, political persecution from government officials who want to silence his activities as a Macedonian separatist. On appeal, the Ivanovs claim that the BIA's negative credibility finding was not supported by the record because the discrepancies on which the BIA based its decision were insignificant or irrelevant.

Ivanov[1] was born in 1950 and raised in Brejani, Bulgaria in the Macedonian region of southern Bulgaria. While growing up, he claims that he was subjected to constant assimilation pressure from the Bulgarians, but that he was raised with a strong Macedonian identity because his father was politically active as a Macedonian separatist. He testified that there has been extreme hatred between Macedonians and Bulgarians, and that Bulgarian authorities have tried to forcibly assimilate Macedonians. According to Ivanov, his father died in a suspicious coal mining accident in 1961, and everyone in his village believed that his father was killed by the government "because of his beliefs."

He also testified about his own run-ins with the authorities. In the statement attached to his second asylum application, Ivanov reported that he was badly beaten by police during a 1968 parade in support of Macedonian rights. Later, after he had professed support for Macedonian independence, Ivanov had two other incidents with authorities while he was working at a Danube port in northern Bulgaria. Ivanov testified that in the first incident, which occurred in 1974, his coworkers provoked him by asking him whether Macedonia belongs to Greece or Bulgaria. Ivanov responded that Macedonia belongs to the Macedonians, and the next day two policemen took him into custody and interrogated him for three days. According to Ivanov, the police revoked his sailor's papers and called him a fascist. In the second incident, which occurred two years later, Ivanov again tried to defend his views on Macedonian independence to his coworkers. Shortly thereafter the police detained him, interrogated him for several days, and forced him to sign a form stating that if he pursued his political activities, he would be incarcerated for fifteen years.

Ivanov became more involved in political separatist activities after the Communist dictator Todor Zhikov was ousted from power in 1989. Ivanov returned to his home village and, along with three other individuals (George Markov, Spasko Nikolov, and Boyko Petrov), became one of the leaders of a local Macedonian political organization called UMO Ilinden.[2] He attended and spoke at many rallies in favor of Macedonian independence and held more than 20 UMO Ilinden meetings at his mother's home in Brejani. As a result of these activities, Ivanov stated that local police and "secret service" officers ha-

---

1. Elena's application for asylum is derivative of her husband's; the outcome of Dimitar's case determines the result of Elena's. *See* 8 U.S.C. § 1158(b)(3) (2000); 8 C.F.R. § 207.7(a) (2000). Consequently, we address the substantive claims made in this appeal in terms of how they relate to Dimitar.

2. In *Angoucheva v. INS*, 106 F.3d 781 (7th Cir.1997), we discussed the role of UMO Ilinden in the Macedonian separatist movement. United Macedonia Organization ("UMO–Ilinden"), which was formed in 1990 to promote the rights of Macedonians living in Bulgaria, had never been recognized by the Bulgarian government and in fact had been declared illegal, a decision upheld by Bulgaria's courts. *Id.* at 787. According to the U.S. Country Reports on Human Rights Practices for 1992, in 1990 the Bulgarian government denied UMO–Ilinden registration as a legal organization in Bulgaria and in 1992 the police broke up the group's meetings. More recent U.S. Country Reports editions, however, did not discuss any reported incidents of Bulgarian oppression of the Macedonian separatist movement.

rassed him and warned him to stop his political involvement or be harmed "in a very bad way." The police also issued similar warnings to Markov, Nikolov and Petrov. Local police later arrested and beat Markov. Ivanov believes that Markov was detained a second time and that Markov's death resulted directly from mistreatment at the hands of the police. The Ivanovs claim that they left Bulgaria because Dimitar was convinced that he was in imminent danger and that like his father, he would be the victim of a staged "accident."

Ivanov and his wife entered the United States in January 1991 as nonimmigrant visitors authorized to stay in the country for six months. In his initial asylum application, which was submitted six days after arriving in the United States, Ivanov stated that he was seeking political asylum and permanent U.S. residency. His application, however, failed to mention that he is Macedonian or that he had been subjected to persecution for his nationality; in fact, Ivanov specified that the only reason he feared persecution at home was reprisal for his efforts to seek asylum in the United States. The Ivanovs also admitted that they told the asylum officer that they did not belong to any opposition groups and they did not specifically mention Dimitar's ties with the UMO Ilinden. With the assistance of counsel, Ivanov filed a second asylum application in November 1993 that details his political activities and describes his fears of returning to Bulgaria because he believes that government officials, who are still linked to the Communist party, will find him and harm him.

Because the Ivanovs remained in the U.S. after the six-month authorization period ended, the Immigration and Naturalization Service ("INS") issued an Order to Show Cause and Notice of Hearing, charging them with deportability under INA § 241(a)(1)(B), 8 U.S.C. § 1231(a)(1)(B).

A deportation hearing was held in July 1993, during which the Ivanovs admitted that they overstayed their authorized visa and requested asylum, withholding of deportation, and, in the alternative, voluntary departure. On February 15, 1994, the immigration judge ("IJ") held an evidentiary hearing on the Ivanovs' application for asylum and withholding of deportation. At the hearing, Ivanov and the INS submitted various documents relating to the mistreatment of ethnic minorities in Bulgaria and the Ivanovs and two of their friends testified that Dimitar had been an active member in UMO Ilinden.

At the IJ's request, the State Department's Board of Human Rights and Humanitarian Affairs ("BHRHA") issued an advisory opinion, observing that although Bulgaria was once the "most faithful Soviet satellite, [it] has made substantial progress toward democracy . . . ." The advisory opinion conceded that "[e]thnic Turks and to a lesser extent Macedonians suffered in the mid–80's from the government's assimilation policies, which have, however, been largely rectified since." But the report concluded that "country conditions have so altered as to remove the presumption that past mistreatment in the Communist years will lead to mistreatment in the future." The same report noted, however, that "[t]he Macedonian Separatist Ilinden [UMO Ilinden] is not registered as a legal entity . . . ."

On March 11, 1994, the IJ issued an oral decision denying the Ivanovs' applications, finding that Dimitar Ivanov's claim was "simply too speculative to warrant a finding that he would be singled out for persecution or that he has established his own inclusion in and identification with others similarly situated who have been persecuted so as to conclude that his fear of returning to Bulgaria is reasonable." In

reaching his conclusion, the IJ expressed certain concerns about Ivanov's credibility:

There [sic] credibility of the respondents is of extreme importance in assessing their claims. I have taken into account the rationality, internal consistency, and inherent persuasiveness of their testimony. I do note that the respondent has admitted not mentioning his political activities with OMO Ilinden on his original application with the Service (Exhibit 6) which he attributes to his lack of familiarity with the application process and their limited English language capabilities. This still does not, however, account for why he did not mention this aspect of his case at his interview. Although I cannot conclusively determine that the male respondent is completely lacking in credibility, in view of the foregoing it is possible to surmise that the extent of his involvement with this organization may be somewhat exaggerated so that his testimony as to the prominence or visibility of his role in this organization may not be entitled to full evidentiary weight.

The IJ based his decision on the written submissions from the parties and the testimony from the Ivanovs and their witnesses. The IJ denied both applications but granted the Ivanovs' alternative request for voluntary departure on or before September 11, 1994. The Ivanovs appealed the IJ's decision to the BIA.

Building on the IJ's decision, the BIA found "several significant discrepancies" in the record between Ivanov's testimony, other witness testimony, and the two asylum applications. Specifically, the BIA noted four material discrepancies that undercut Ivanov's credibility and his claim of persecution:

- Ivanov failed to mention in his first asylum application his involvement and leadership in the Brejani UMO Ilinden, the harassment he suffered, his interrogations in Bulgaria, the beating he suffered in 1968, and the arrests of other UMO Ilinden leaders. The BLA found it highly dubious that he would have inadvertently omitted such critical details if the reason he left Bulgaria was because of his problems with the authorities stemming from his support of Macedonian rights;

- The BIA questioned whether Ivanov really was an active leader and member of the UMO Ilinden because his testimony was confused regarding which Ilinden organization he led (UMO Ilinden or OMO Ilinden) and where the group was headquartered (Sofia or Pirin Macedonia);

- The BIA noted the material discrepancies between Ivanov's second asylum application, which failed to mention his "numerous encounters with local policemen who warned him to stop his political activities," and his testimony at the deportation hearing, which described his mistreatment in much greater detail. The BIA noted that Ivanov had failed to mention any of these encounters in his second asylum application and merely indicated that the government had "spied" on his organization;

- The BIA noted the many discrepancies between Ivanov's testimony and that of one of his witnesses—Ivan Christov—as to the fate of George Markov, another UMO Ilinden leader. Although Christov corroborated Ivanov's testimony when he stated that Markov was arrested in November 1990, he also testified that Markov had not been arrested again after November 1990 and did not mention that Markov had been badly beaten during the 1990 arrest. Ivanov, on the other hand, testified that Markov had been arrested in November 1990, that he was badly beaten at that time, that he was arrested again in 1991, and that he had died as a result of government mistreatment in 1993.

In affirming the IJ's decision, the BIA concluded that:

> [g]iven the material discrepancies that relate to the heart of the respondent's asylum claim, we agree with the Immigration Judge that there are reasons to be concerned with the respondent's credibility. The respondent has failed to sustain his burden of proof to demonstrate by sufficiently consistent and credible testimony that he was a victim of past persecution or that he has a well-founded fear of persecution . . . .

Moreover, the BIA held that because Ivanov failed to satisfy the lower burden of proof required for asylum, he could not satisfy the clear probability standard for withholding of deportation.

■ We have jurisdiction under § 106 of the INA, 8 U.S.C. § 1105a, which provides exclusive jurisdiction for judicial review of all final orders of deportation.[3] Review of the BIA's asylum decision is deferential under the substantial evidence test. Under that test, we uphold the BIA's decision if it is supported by reasonable, substantial, and probative evidence from the administrative record as a whole, see *Mansour v. INS*, 230 F.3d 902, 906 (7th Cir.2000); *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir.1999); *Sofinet v. INS*, 196 F.3d 742, 746 (7th Cir.1999), and will reverse only if the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution," *Ahmad*, 163 F.3d at 461. Credibility determinations are also reviewed under the substantial evidence test; they are entitled to

substantial deference and should only be overturned under extraordinary circumstances. *Ahmad* at 461. Thus, so long as the BIA's decision is supported by "specific, cogent reasons," we will not second-guess that determination. *Id.*

Ivanov argues that he is entitled to asylum because he has a well-founded fear of future persecution based on past persecution and hostile political circumstances in Bulgaria. He claims that he was persecuted in the past due to his involvement in UMO Ilinden and that he fears he will be killed if he returns to Bulgaria. Ivanov once again attempts to explain the discrepancies between his testimony, his witnesses' testimony and the documentary evidence submitted by both sides by claiming that the inconsistencies are minor and irrelevant, and to the extent that discrepancies exist, they are easily explained by language barriers and the asylum officer's perfunctory assistance when they first applied for asylum. Specifically, the Ivanovs contend that the confusion at the deportation hearing regarding whether Dimitar belonged to UMO or OMO Ilinden stemmed from translation difficulties—the initials UMO in English translate to OMO in Bulgarian. As for Ivanov's varying testimony regarding the location of the Ilinden headquarters, the Ivanovs claim that Dimitar correctly testified that the group originated in Pirin Macedonia but that it was currently headquartered in Bulgaria. Finally, with respect to the contradictions between Christov's and Ivanov's testimony regarding the arrest and detention of Markov, the Ivanovs claim that the two men's stories are not inconsistent.[4] The Ivanovs

---

3. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") repeals 8 U.S.C. § 1105(a) and replaces it with a new jurisdictional review provision codified at 8 U.S.C. § 1252. *See* IIRIRA § 306(c)(1), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996), as amended by Act of Oct. 11, 1996, Pub.L. No. 104–302, 110 Stat.

3656. Because this new provision does not apply to petitioners whose deportation proceedings commenced before April 1, 1997, as is the case here, we continue to have jurisdiction under 8 U.S.C. § 1105a.

4. Although the Ivanovs argue that their versions are not inconsistent, it appears from the

claim that the BIA's findings were not supported by substantial evidence.

■ To qualify for asylum, Ivanov must show that he is a refugee—a person who is "unable or unwilling" to return to his native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To meet that burden, Ivanov must present specific facts demonstrating that he has actually been the victim of persecution or has good reason to believe that he will be singled out for persecution. *Petrovic v. INS,* 198 F.3d 1034, 1037 (7th Cir.2000). Persecution is more than mere harassment, *see Sofinet v. INS,* 196 F.3d 742, 746 (7th Cir.1999), and unpleasant or even dangerous conditions in the midst of political upheaval do not necessarily rise to the level of persecution, *see Mitev v. INS,* 67 F.3d 1325, 1330 (7th Cir.1995). Moreover, "an applicant for asylum must show more than mere membership in a group that, assuming *arguendo,* is subject to some level of persecution .... [t]he applicant must also show that he is more likely than other members of the group to be persecuted." *Ahmad,* 163 F.3d at 463. To show a "well-founded fear" of persecution a petitioner must demonstrate both that the fear is subjectively genuine and that it is an objectively reasonable belief. *See Mitev,* 67 F.3d at 1331. Ivanov must show "specific, detailed facts supporting the reasonableness of [his] fear that [he] will be singled out for persecution." *Sofinet,* 196 F.3d at 746.

■ The evidence as a whole is insufficient to establish either past persecution or a well-founded fear of future persecution. As an initial matter, the specific facts that Ivanov offers in support of his

past-persecution claim show only that he was beaten by authorities during a rally in 1968 (before he was actively involved in UMO Ilinden), that he was twice questioned by police in 1974 and 1976 when he spoke out in favor of Macedonian independence while he was working as a sailor in northern Bulgaria, and that he and others were warned by police to cease Macedonian separatist activities after becoming involved in UMO Ilinden in 1990. He also claims that Markov was detained and beaten, and that he had heard that Markov had died as a result of mistreatment at the hands of the government. But Dimitar's version conflicts with Christov's and is thus entitled to less evidentiary weight. Beyond his own allegations and testimony, the record contains no other evidence identifying and detailing his alleged persecution. This kind of harassment and unfulfilled threats is insufficient to establish past persecution. *See Zalega v. INS,* 916 F.2d 1257, 1260 (7th Cir.1990) (petitioner's arrests and interrogations regarding his association with the Solidarity party in Poland insufficient to show past persecution).

■ Moreover, substantial evidence in the record supports the BIA's decision that Ivanov's evidence of past persecution lacks corroboration, credibility and detail. Ivanov's claim of persecution is undermined by the couple's failure to mention Ivanov's political activism as a reason for seeking asylum in their initial applications, as well as the omission of accounts of the harassment and beatings that Dimitar claims he suffered at the hands of authorities who opposed Macedonian separatist activities. The Ivanovs had several opportunities to set forth their past persecution or their basis for future persecution in

record that the BIA reasonably could have found a material discrepancy in this testimony. Christov testified that Markov was arrest-ed only once but Ivanov testified that Markov was arrested two or three times during that same period.

their initial asylum application, often by simply answering a yes or no question, but they did not do so. The BIA, as did the IJ, reasonably could believe that these omissions and discrepancies undermined the credibility of the Ivanovs' allegation of persecution, and we are "simply not in a position to second-guess those kinds of factual findings and credibility determinations." *See Mansour v. INS*, 230 F.3d 902, 906 (7th Cir.2000). "Without a concrete explanation other than the language difficulty for the discrepanc[ies], [we must] accept the BIA's adverse credibility determination." *Id.*

 Ivanov's failure to credibly establish past persecution also undermines his argument of a well-founded fear of future persecution. If an alien establishes past persecution, there is a rebuttable presumption that he also has a well-founded fear of future persecution and therefore should be granted asylum. *See* 8 C.F.R. § 208(b); *see also Asani v. INS*, 154 F.3d 719, 722 (7th Cir.1998). But the reverse also often holds true: "Because the asylum laws assume that the past is often prologue to the future, petitioners' failure to show past persecution, without more, bodes poorly for their attempt to show a well-founded fear of persecution." *Marquez v. INS*, 105 F.3d 374, 380 (7th Cir. 1997). This is particularly true when evidence shows that conditions in the home country have changed so dramatically as to undermine the well-foundedness of that fear. *Id.* In denying eligibility, the IJ relied on an advisory opinion from the BHRHA concluding that country conditions in Bulgaria "have so altered as to remove the presumption that past mistreatment in the Communist years will lead to mistreatment in the future." Indeed, the 1999 U.S. Country Report on Bulgaria observes that "[t]here were no reports of any prosecutions for simple membership in [UMO Ilinden]." We have recognized State Department reports as authoritative sources on the current political situation in foreign states and, therefore, helpful in determining whether an asylum applicant's fear of future persecution is well-founded. *See Tamas–Mercea v. Reno*, 222 F.3d 417, 423 (7th Cir.2000). Ivanov offered no equally credible source of information to rebut the State Department's assessment of the likelihood of persecution under the current regime.

 As an alternative to asylum, the Ivanovs seek a withholding from deportation. The standard for withholding of deportation is even more stringent than that for asylum; Ivanov must establish a "clear probability of persecution," meaning that it is more likely than not that he will be persecuted upon return to Bulgaria. *Dobrican v.. INS*, 77 F.3d 164, 168 (7th Cir. 1996). As discussed above, Ivanov has not met his burden of establishing that he is eligible for asylum. Accordingly, he cannot satisfy the more stringent requirements for withholding of deportation. The decision of the BIA is AFFIRMED.