Stefan CABEL, et al., Petitioners,

v.

John ASHCROFT, United States
Attorney General,
Respondent.

No. 03–1304.

United States Court of Appeals,
Seventh Circuit.

Submitted April 5, 2004.*

Decided April 6, 2004.

Y. Judd Azulay, Azulay, Horn & Seiden, Chicago, IL, for Petitioners.

George P. Katsivalis, Department of Homeland Security, Office of the District Counsel, Chicago, IL, Richard M. Evans, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before BAUER, COFFEY, and ROVNER, Circuit Judges.

**ORDER**

Romanian citizens Stefan and Elena Cabel and their daughter Stefania entered

---

* This appeal was submitted on the briefs and the record after we granted the appellant's motion to waive oral argument. *See* Fed. R.App. P. 34(f); Cir. R. 34(e).

the United States illegally, and in 1997 the Immigration and Naturalization Service began deportation proceedings against them. The Cabels conceded deportability, but applied for asylum and requested withholding of deportation, alleging that Stefan had suffered persecution in Romania on account of his political opinion and feared future persecution should he return. The Immigration Judge denied their application, and the Board of Immigration Appeals affirmed the IJ's decision without opinion. We deny the petition for review.

In January 1998 Stefan applied for asylum, asserting that he had been arrested and beaten by the Romanian police on several occasions because of his anti-communist views and his membership in the National Peasant Party ("NPP"). He also stated that the police and the city unfairly fined and taxed his business in retaliation for his political beliefs, leading to his financial ruin. Stefan claimed that, if forced to return to Romania, his family "would be further subjected to the deliberate imposition of substantial economic disadvantage."

An Immigration Judge held a hearing on the merits of Stefan's asylum application. At the hearing, Stefan described the physical abuse and economic hardships to which the Romanian government had subjected him. He stated that his problems began in 1983 when he was working for an international restaurant in Fagaras, Romania. The police, who were members of the then-ruling communist party, asked him to become an informant who would report on the activities of the restaurant's foreign patrons, and he refused. Shortly thereafter, Stefan was arrested on charges (which he denied) of carrying foreign currency. He was detained for several days, during which time the police interrogated and beat him. Two years later, Stefan was again arrested, this time on charges of purchasing an item with foreign currency. When he refused to confess, the police subjected him to a series of beatings by, for example, hitting him on the bottom of the feet with a board or trampling on top of him. A year later, Stefan was arrested for purchasing a video camera, allegedly for the illegal purpose of reselling it at a markup. Stefan continued to be detained and questioned by the police for two-to-three day periods approximately once a year after that; he ascribes these frequent interrogations to his refusal to join the communist party.

Stefan further testified that in January 1990 he joined the National Peasant Party, a political organization that opposed communist rule and sought democratization and privatization. Immediately after joining the NPP, Stefan was elected to the nine-member board of the Fagaras chapter, and one of his responsibilities was spreading the party message throughout the region. At that time, the National Salvation Front ("NSF") party held control of the country, and Stefan claims that many of the NSF's officers were individuals who had beaten or interrogated him during the communist era. According to Stefan, one night one of those officers came to the restaurant where he worked, closed it down, and began searching it for any evidence of illegal activity. The officer also searched Stefan's residence and arrested him. The officer interrogated Stefan for three to five hours, repeatedly telling him "okay, you want democracy, I'll show you democracy," which Stefan interpreted as a threat. Stefan was released when the police could find no crime to charge him with.

That summer Stefan claims that he and other members of the NPP were attacked in the street by members of the NSF. He suffered a hairline fracture of his right leg. Stefan filed a complaint with the police, but he says no action was taken on it.

Stefan further testified that the government began exerting economic pressure on him in August 1992, when his supervisor at the restaurant, a member of the NSF, fired him. Rather than seek another job, Stefan borrowed 300,000 lei from the local bank and opened a grocery store. He and his wife ran the store for four years, during which time they were constantly fined for offenses (unspecified in the record) during so-called "inspections" carried out by the police and officials from the Fagaras city hall. The first fine, for 300,000 lei, came approximately two months after the store opened, and the total fines amounted to more than 2 million lei. The store's financial condition worsened when the city amended Stefan's lease to increase the rent tenfold to 1,200,000 lei per month. Although the rent increase purportedly applied to all business owners in Fagaras, Stefan claims that city officials applied it only to political enemies. Stefan was required to pay the rent increase retroactively, and the city sued him for back rent. To pay off these obligations, Stefan borrowed more money from the bank, increasing his total debt to 40 million lei. To repay the bank, he was forced to sell the store, his car, his house, and a number of other possessions.

Shortly thereafter, Stefan obtained visas to Mexico for his family and then paid for the family to be smuggled into the United States. He said he fears returning to Romania because many of the officials who fined or beat him remain in power, and have even been promoted in rank.

The IJ denied Stefan's application for asylum and withholding of deportation. Although the IJ believed that Stefan's testimony was "forthcoming," he concluded that Stefan had not demonstrated past persecution. Specifically, the IJ noted that Stefan had not presented evidence of a "relationship between [his political] activ-

ity and the bankruptcy of his business." Turning to the likelihood of future persecution, the IJ noted that the country report from the U.S. State Department showed that, contrary to Stefan's contentions, a new regime had taken power since his departure from Romania. Because that regime represented a "significant break" with Romania's communist past, the IJ did not believe that Cabel would face future persecution if returned there. The IJ did agree to grant the Cabels voluntary departure.

On appeal, Stefan argues that the IJ erred in concluding that he was not eligible for asylum on the basis of past persecution. He argues that his testimony that he was run out of business through a series of escalating rents and taxes was sufficient to establish that he suffered a substantial economic disadvantage on account of his political opinion. He also claims that the IJ should not have looked beyond this testimony for evidence corroborating Stefan's claim that the rents and taxes were politically motivated.

When the BIA affirms an IJ's decision without issuing a decision of its own, we review the IJ's analysis as if it were the BIA's, and uphold it if it is supported by substantial evidence. *Oforji v. Ashcroft*, 354 F.3d 609, 612 (7th Cir.2003). Reversal is appropriate only if a reasonable fact finder would be compelled to find that Stefan suffered from past persecution or faced future persecution. *Id.* at 613.

Asylum is available to aliens who are "unable or unwilling" to return to their home country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Ememe v. Ashcroft*, 358 F.3d 446, 450 (7th Cir.2004). The statute does not define the term "persecution," but we have held that it can include "non-life-

threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe." *Capric v. Ashcroft,* 355 F.3d 1075, 1084 (7th Cir. 2004). However, the generalized economic woes that may befall an entire population do not entitle an alien to asylum; he must show that he was targeted for substantial financial harm because of his political opinion. *Borca v. INS,* 77 F.3d 210, 216 (7th Cir.1996).

We agree with the IJ that Stefan's claim must fail because he has not demonstrated that any of the economic deprivation he suffered occurred because of his political opinion. The events that Stefan describes–the loss of his restaurant job and the failure of his business due to heavy government fines–are certainly very serious, and may amount to a substantial economic deprivation, *cf. Capric,* 355 F.3d at 1092–93, but he must also provide some evidence, whether direct or circumstantial, that his persecutors were motivated by a desire to punish him for his political opinion, *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Stefan has presented only his own subjective belief that his financial woes were incurred due to his political beliefs, and this alone is not sufficient to support the grant of asylum. *See Sofinet v. INS,* 196 F.3d 742, 747 (7th Cir.1999). Accordingly, the IJ's determination that Stefan was not entitled to asylum based on past persecution was supported by substantial evidence.

■ Further, even if Stefan could establish that he suffered past persecution, the government has met its burden of showing that Stefan does not have a well-founded fear of future persecution. The government presented evidence—namely the country report–that conditions in Romania have improved, beginning in 1996 when elections resulted in a "significant break" with the country's communist past. U.S. Department of State, ROMANIA: PROFILE OF ASYLUM CLAIMS AND COUNTRY CONDITIONS (January 1997). According to this report, citizens have progressively "rejected" leaders associated with the previous regimes of Ceausescu and Ion Iliescu, under which Stefan claimed persecution. *Id.* The country report further states that the climate for political expression has so improved as to remove "any presumption that past mistreatment ... will lead to future mistreatment." *Id.; see Pop v. INS,* 279 F.3d 457, 461–62 (7th Cir.2002). Although Stefan testified that the officers who had previously abused him remain in power, the Department's report was entitled to more weight than this unsubstantiated testimony. *Dobrota v. INS,* 195 F.3d 970, 974 (7th Cir.1999); *Gramatikov v. INS,* 128 F.3d 619, 620 (7th Cir.1997). Therefore, the IJ's determination that Stefan and his family were not entitled to asylum based on a likelihood of future persecution was also supported by substantial evidence.

The petition for review is DENIED.