**Erlind EREBARA and Matilda Erebara, Petitioners,**

v.

**John D. ASHCROFT, Attorney General of the United States, Respondent.**

Nos. 03–1201, A77–833–412, A77–833–413.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 15, 2004.

Decided Feb. 18, 2005.

M. A. Hannigan, Chicago, IL, for Petitioners.

George P. Katsivalis, Department of Homeland Security, Office of the District Counsel, Chicago, IL, Carl H. McIntyre, Jr., Marion E. Guyton, Department of Justice, Washington, DC, for Respondent.

Before BAUER, COFFEY, and SYKES, Circuit Judges.

ORDER

Erlind Erebara, a Muslim and ethnic Albanian from Kosovo, petitions for review of the BIA's order denying his application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). His Albanian wife, Matilda Erebara, joins the petition. Erebara's request for asylum was denied by the IJ and subsequently by the BIA in a summary affirmance. We deny the petition.

Erebara, who was born in 1973, fled Kosovo for the United States in July 1999. He asserts that in Kosovo a notorious thug and former secret police officer named Vuk Petrovic threatened his life several times because of his family—which he characterizes in his asylum application as a

"social group" that has been subject to persecution. The threats stem from the 1988 death of Petrovic's brother, who was under the care of Erebara's father, a doctor. Petrovic's brother had been brought with unspecified "wounds" to the local hospital where Erebara's father was working as "head of the night shift." The brother died, however, and Erebara asserts that Petrovic "blame[d] it on my father." Three years later, in April 1991, Erebara's father collapsed and died on the family doorstep after returning, a friend later told Erebara, from meeting Petrovic at a local coffee shop. Although hospital authorities concluded in an apparent autopsy that the father died of natural causes, Erebara is convinced, after speaking with a doctor friend of his father's, that Petrovic poisoned his father in revenge for his brother's death.

Erebara himself met Petrovic only once, in July 1999, in his home town of Pristina. Erebara was walking down the street with several others when Petrovic passed by, "picked me up out of the crowd and told me that you'll end up like your father." Alarmed, Erebara left Kosovo that same day to get his wife in Albania; within two days, they had purchased false passports and left for the United States. Before Erebara left for Albania—and presumably before he bumped into Petrovic, although the record is unclear on this point—his wife received an anonymous telephone call threatening that "pretty soon you're going to be a widow." Erebara suspects Petrovic made the threatening call.

Erebara's asylum application stated an additional basis for his persecution claim: two incidents unrelated to Vuk Petrovic in which he was physically abused by Serbian police officers because of his race (ethnic Albanian) and religion (Muslim). Erebara testified that in February 1992 Serbian police came to his home "looking for weapons which we never had." Erebara further testified that the officers "started beating my mother," and that when he tried to intervene, they began "beating, kicking, and pushing [me]." Erebara's mother died of a heart attack one month later, although nothing in the record ties her death to the encounter. The second incident took place in December 1997. Erebara, who is a musician, was returning late at night from performing at a wedding when he was accosted by Serbian police officers. They told him, "if you keep on playing Albanian weddings we'll cut off your fingers," and, breaking off a bottle, "tried to amputate one of [his] fingers." According to Erebara's asylum application, "one of the officers sliced open my right hand using [the] broken beer bottle, creating a flesh would [sic] across my palm." But just then, several people "began to walk by and the Officer stopped." Erebara's application stated that the wound had prevented him from performing for six months, and he testified at the hearing that he still bore a scar on his palm.

Erebara filed his asylum application in October 1999, and immigration authorities initiated removal proceedings several months later. In denying the application, the IJ separately addressed Petrovic's threats and one of the assaults by Serbian police officers. The IJ first concluded that Petrovic's threats did not constitute persecution: no proof supported Erebara's speculation that Petrovic had murdered his father; the incident in which Petrovic allegedly threatened Erebara in 1999 was "highly implausible" because Petrovic, an alleged war criminal, would not have freely walked the streets of Pristina for fear of being apprehended by UN or NATO forces. The IJ also stated that the 1992 incident in which Erebara and his mother were attacked did not rise to the level of past persecution because Erebara was neither detained nor suffered further conse-

quences from the incident. In addition, the IJ stated that even if Erebara had been able to demonstrate past persecution at the hands of either Petrovic or the Serbian police, "the dramatic change in the Yugoslav government" made it "highly unlikely" that he would be subject to future threats or mistreatment upon returning. The IJ granted Erebara voluntary departure, and the BIA affirmed without opinion.

We review the IJ's factual findings under a highly deferential version of the substantial evidence test. *Awad v. Ashcroft*, 328 F.3d 336, 341 (7th Cir.2003). We will reject the IJ's findings only upon such compelling evidence that no reasonable fact finder could fail to find the required fear of persecution. *Id.*

■ Erebara must demonstrate that he is a refugee in order to be considered for asylum. Under 8 U.S.C. § 1101(a)(42)(A), a refugee is an individual who fears returning to his or her native country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." While there is no statutory definition of persecution, we have described it as inflicting harm or punishment for reasons that this country views as illegitimate. *Sofinet v. INS*, 196 F.3d 742, 746 (7th Cir.1999). An individual who demonstrates past persecution is presumed to have a well-founded fear of future persecution; however, if that presumption is rebutted by evidence of changed circumstances, past persecution alone will warrant a grant of asylum only when it is particularly severe. *Id.* at 747; 8 C.F.R. § 1208.13(b)(1)(iii)(A).

In this petition, Erebara first argues that the IJ should have given greater weight to the threats that Vuk Petrovic made against him and his wife. He states that when evaluated "cumulatively," these threats—as well as the two run-ins with Serbian police—constitute persecution. Petrovic's threats cannot qualify Erebara for asylum, but the IJ failed to mention the most obvious reason: the lack of a nexus between any persecution and Erebara's membership in a particular social group. *See* 8 U.S.C. § 1101(a)(42)(A); *Tamas–Mercea v. Reno*, 222 F.3d 417, 425–26 (7th Cir.2000) (emphasizing that any persecution must be "on account of" one of five protected grounds to warrant asylum). Erebara contends that Petrovic sought him out because he belonged to a prominent Albanian family, and the family can indeed count as "a particular social group" for asylum purposes. *See Iliev v. INS*, 127 F.3d 638, 642 n. 4 (7th Cir.1997) (collecting cases). Nevertheless, the record overwhelmingly shows that if Petrovic was in fact out to get Erebara, it was not because of his prominent Albanian family name but because of a personal dispute: Petrovic's brother had died under the care of Erebara's father, so Petrovic wanted revenge against Erebara. And a "personal dispute, no matter how nasty, cannot support an alien's claim of asylum." *Marquez v. INS*, 105 F.3d 374, 380 (7th Cir.1997); *see also Roman v. INS*, 233 F.3d 1027, 1034 n. 3 (7th Cir.2000) (finding of persecution would be inappropriate where record shows no evidence of link between persecution and alien's political opinion).

Erebara also asserts generally that his claim of past persecution is supported by the two attacks by Serbian police officers driven by contempt for ethnic Albanians. He contends that the IJ misapplied the law of this circuit in concluding that these incidents were not severe enough to constitute persecution.

A showing of persecution involves a high standard that is difficult to meet without "powerful and moving evidence." *Dandan v. Ashcroft*, 339 F.3d 567, 573–74 (7th Cir.

2003). To constitute persecution, actions must rise above mere harassment. *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir. 2000); *see, e.g., Liu v. Ashcroft*, 380 F.3d 307, 313 (7th Cir.2004) (two-day imprisonment accompanied by hair pulling and shoving, as well as search of alien's apartment found not to be persecution); *Dandan*, 339 F.3d at 574 (three-day detention involving deprivation of food and a beating that left alien's face "swollen" was not persecution). Nevertheless, actions need not go so far as to threaten the alien's life or freedom to compel a finding of persecution. *See Ambati*, 233 F.3d at 1060; *see, e.g., Asani v. INS*, 154 F.3d 719, 723 (7th Cir.1998) (beating with fists and police stick that knocked out two of alien's teeth was probably persecution); *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir.1997) (persecution where alien was punched in the face and also suffered a broken finger).

We were surprised and dismayed to observe that although the IJ briefly described the 1997 hand-slashing incident in his recitation of the facts of Erebara's case, he made no mention of the encounter in his analysis of Erebara's asylum claim. Attempting to amputate an individual's finger with a broken bottle and causing a flesh wound strikes us as quite serious—in fact, it is arguably the most troublesome incident in Erebara's asylum application. *See Diallo v. Ashcroft*, 381 F.3d 687, 697–98 (7th Cir.2004) (noting that slashing of alien's arm by a prison guard could be characterized as "physical torture" and strengthened a showing of past persecution). Yet the IJ inexplicably glossed over the attack, focusing instead on Erebara's implausible contention that Vuk Petrovic poisoned his father.

Despite this significant oversight, the evidence in the record does not compel us to conclude that Erebara suffered past persecution. The hand-slashing incident noted above was indeed serious, and the incident in which police searched Erebara's house and beat him and his mother involved more physical violence. Yet Erebara's vague descriptions of these events do not provide the detailed proof of persecution that would lead any reasonable fact finder to a finding of past persecution. *See Roman*, 233 F.3d at 1034 (alien bears the burden of proving persecution by presenting specific, detailed facts). The record contains no evidence corroborating the assaults or detailing the severity of Erebara's hand injury. *See Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir.1999). And Erebara provided no specifics regarding the 1992 encounter, so we can only speculate as to the extent to which he was "beat[en], kick[ed], and push[ed]." While it is "distasteful to have to quantify human suffering" in this way, "that is our task." *Dandan*, 339 F.3d at 574. We therefore conclude that while Erebara's testimony *could* support a finding of persecution, it does not *compel* such a finding.

■ Erebara next attacks the IJ's conclusion that he does not have a well-founded fear of future persecution, challenging the finding that the government rebutted any presumption of future persecution by showing changed country conditions in Kosovo. *See* 8 C.F.R. § 1208.13(b)(1)(i)(A). Erebara states that the State Department's 2000 Country Report on Yugoslavia—which the government introduced to show changed country conditions—actually shows that for ethnic Albanians in Kosovo "conditions remain severe."

Substantial evidence supports the IJ's finding that changed country conditions undermine Erebara's claim to have a well-founded fear of future persecution. Today's Kosovo is a different place from the country that Erebara left in 1999, shortly after a NATO bombing campaign forced Slobodan Milosevic's troops to withdraw

from Kosovo. The Country Report from 2000 states that ethnic Albanians are no longer a threatened minority group in Kosovo; it is now the Serbs who fear mistreatment at the hands of the majority Albanians. *See also Brucaj v. Ashcroft*, 381 F.3d 602, 607 (7th Cir.2004) (finding that the 2000 Country Report, by showing a "fundamental change in regime," rebutted the presumption of future persecution for Kosovo Albanian). Moreover, we take judicial notice of last year's Country Report, which states that "the high level of revenge-based violence that followed Yugoslavia's 1999 withdrawal continued to decline significantly," and that there were "several instances of Serb violence against Kosovo Albanians, but no reported fatalities." *See Dobrota v. INS*, 195 F.3d 970, 973 (7th Cir.1999) (taking judicial notice of most recent Country Report to determine current country conditions); United States Department of State, *Country Reports on Human Rights Practices—2003: Serbia and Montenegro* (Feb. 25, 2004), *available at* www.state.gov/g/drl/rls/hrrpt/2003/27874pdf.htm. In light of this up-to-date information, remand for further proceedings "would be futile." *See Dobrota*, 195 F.3d at 974.

Erebara next claims that the IJ erred by failing to make a credibility determination at the hearing. His argument is cursory, citing only one BIA case and asserting that "[a]ccording to BIA precedent, a determination of credibility must be made." The case he cites, *In re V–T–S–*, 21 I & N Dec. 792, 796 (BIA 1997), however, does not support that proposition, nor do our own cases. The closest that we have come to such a rule is to remand the denial of asylum applications out of exasperation for the unreasoned nature of the IJs' decisions. Although in several such cases, the IJ's failure to make a credibility

determination added to the confusion, *see Diallo*, 381 F.3d at 698–700; *Muhur v. Ashcroft*, 355 F.3d 958, 961 (7th Cir.2004); *Niam v. Ashcroft*, 354 F.3d 652, 658 (7th Cir.2004); *Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir.2003), the cases do not create a requirement for IJs to make credibility determinations in every case. Thus, Erebara's claim on this point fails.

Finally, Erebara renews his request for withholding of removal and relief under the CAT yet he advances no argument nor cites any legal authority showing why the IJ erred in denying this relief. He has, therefore, forfeited these claims. *See* Fed. R.App. P. 28(a)(9)(A); *Heft v. Moore*, 351 F.3d 278, 285 (7th Cir.2003).

DENIED.