UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued April 14, 2006
Decided May 25, 2006

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 05-2087

| | |
|---|---|
| RAJENDRAKUMAR PATEL,<br>                    *Petitioner*,<br><br>           *v.*<br><br>ALBERTO R. GONZALES,<br>                    *Respondent*. | Petition for Review of<br>an Order of the Board of<br>Immigration Appeals<br><br>No. A78-746-167 |

**O R D E R**

In 2001, Rajendrakumar Patel came to the United States from Kotha, a small village in the Indian state of Gujarat, seeking asylum.  Gujarat has a well-known history of Hindu-Muslim conflict, sometimes erupting in large-scale violence.  See, e.g., Human Rights Watch, " 'We Have No Orders To Save You':  State Participation and Complicity in Communal Violence in Gujarat," Vol. 14 No. 3(c) (Apr. 2002), available at http://hrw.org/reports/2002/india (describing massive and deadly rioting in early 2002).

According to Patel--a son of Hindu farmers who describes himself as a "peacemaker"--a spate of rioting in September 2000 led to a heightened police presence in his region.  Hoping to gain favor with the police, Patel would occasionally bring them food when they were out on patrol.  This led to rumors that Patel was collaborating with the police, and he was soon visited by Muslim insurgents seeking information about the police's activities.  Despite Patel's repeated professions of ignorance, the men returned several times, assaulting him, threatening him, and

even setting fire to his father's fields.  He tried to escape to the nearby city of Ahmedabad, but after seeing one of his assailants at the train station he realized he hadn't gone far enough.  Even New Delhi, more than 500 miles away, was no haven--again catching sight of his pursuer in the train station of that metropolis, Patel decided he had to leave the country altogether.  Making use of $7000 from his parents (which they raised by selling jewelry and farmland) and another $400 from a friend in New Delhi, Patel made the trip to the United States.

An immigration judge denied Patel's request for asylum for one reason:  he didn't believe Patel's story.  He found it implausible that a militant Muslim group would devote its energies to pursuing an obscure farmboy, repeatedly visiting his home and chasing him all the way to New Delhi, especially after he kept insisting he didn't know anything.  The IJ also considered it unlikely that one of Patel's assailants would appear at the train station in both Ahmedabad and New Delhi at the precise moment that Patel was passing through--a claim made even more dubious by Patel's inability at the hearing to offer any description of the man other than that he was dressed in Muslim garb.  On top of that, the IJ questioned the ability of Patel's parents to raise $7,000 on short notice and wondered why someone in the position Patel described would think of the United States as the place to go rather than somewhere else in India.  Finding no independent corroboration of his story, the IJ thought it more likely that Patel came to this country for economic reasons and simply made up the story about being chased here by Muslims, and so he denied asylum.  The BIA affirmed without comment.

Now asking us to review the IJ's decision, Patel points to some observations the IJ made during the course of the hearing about "discrepancies" in his account.  For example, Patel said that the population in his village was evenly split between Hindus and Muslims, but that the Hindu-Muslim ratio in Gujarat as a whole was closer to 80/20.  And although Patel's story began with rioting in Ahmedabad in September 2000, the State Department's Country Report referred only to riots in August of that year.  Patel suggests that these aren't really discrepancies at all, and we have no reason to disagree with him.  But these supposed discrepancies weren't the factors on which the IJ relied in making his credibility determination.  In fact, with respect to the absence of evidence supporting Patel's timing of the riots, the IJ specifically noted that his lack of corroboration was "a separate matter from his credibility."  The IJ's disbelief was based not on these minor discrepancies, but on the overall implausibility of Patel's story.

Patel argues that the IJ's perception of implausibility was biased by an unwarranted assumption that Patel, as a farmer, was somehow not important enough to be persecuted.  He quotes the IJ's observation that Patel "was not a public figure . . . was not a member of any political party . . . was only a farmer's son who worked in the fields," and cites cases holding that insufficient prominence is not a basis for rejecting a claim of persecution.  E.g., Galius v. INS, 147 F.3d 34, 45–46 (1st Cir. 1998).  But the IJ wasn't saying that farmers in principle can't be persecuted--he just doubted that a group of Muslim radicals would waste their time chasing a person like Patel all the way across the country.  Patel's social and political status is central to the plausibility of his story, and the IJ properly included it in his analysis.

Patel also argues that the IJ improperly found him ineligible for voluntary departure, but we don't have jurisdiction to review that determination.  See 8 U.S.C. § 1229c(f); Lopez-Chavez v. Ashcroft, 383 F.3d 650, 652 (7th Cir. 2004); Sofinet v. INS, 196 F.3d 742, 748 (7th Cir. 1999).  Having found that the IJ's negative credibility assessment was not improper, we DENY Patel's petition for review.